**Flor Maria SOTO, Plaintiff, Appellant,**

v.

**Carlos FLORES, et al. Defendants, Appellees.**

No. 96–1024.

United States Court of Appeals, First Circuit.

Heard June 7, 1996.

Decided Jan. 13, 1997.

Jose Enrique Colon Santana, with whom Gary Broida, Rio Pierdas, PR, was on brief, for appellant.

Vannessa Ramirez, Assistant Solicitor General, Department of Justice, Hato Rey, PR, with whom Carlos Lugo–Fiol, Solicitor General, was on brief, for appellees.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

On April 21, 1991, Angel Rodriguez shot to death his two young children and then killed himself. This tragedy occurred four days after Rodriguez's wife, Flor Maria Soto, complained to the police about the physical and emotional abuse she suffered at Rodriguez's hands. The police, knowing Rodriguez had threatened to kill Soto and her family if Soto went to the police to have him jailed for his spousal abuse, nonetheless violated their obligations of confidentiality and informed Rodriguez of Soto's complaints. Having done so, the police did not jail Rodriguez or take steps to protect Soto and her family. Soto's lawsuit alleges that Rodriguez did what he had threatened to do and that the state created this danger. Rather than pursue any claims

available to her under Puerto Rican law, Soto chose to bring suit in federal court alleging constitutional tort theories.

Soto brought suit under 42 U.S.C. § 1983, claiming that the actions of the defendants, Carlos Flores, a police officer, and Ismael Betancourt–Lebron, Puerto Rico's superintendent of police, violated her and her children's rights to substantive due process and to equal protection of the laws. The district court granted summary judgment in favor of the defendants. We do not reach the difficult question of whether Soto, in her capacity as a representative of her dead children, has presented a due process claim that would survive summary judgment, because we find that the defendant officers are protected by qualified immunity on that claim. As to the equal protection claim, we adopt a standard for measuring such claims in domestic violence cases. Testing the evidence against that standard, we find that Soto has not adduced sufficient evidence of discriminatory intent to survive summary judgment. Accordingly, we affirm the district court.

## I. Facts

We recite the facts in the light most favorable to the plaintiff, the party opposing summary judgment. Flor Maria Soto married Angel Rodriguez, nicknamed Rafi, in 1981. Rodriguez and Soto had two children: Sally was born in 1983, and Chayanne, a boy, in 1988. Approximately a year into their marriage, Rodriguez began to abuse Soto emotionally and physically. This abuse, often connected to Rodriguez's drinking, continued throughout their marriage. The abuse was apparent to family and friends. As one neighbor put it, "anyone who visited them could tell that [Soto] was an abused wife." Despite his constant mistreatment of Soto, Rodriguez never abused the children.

Rodriguez did gardening and vehicle repair work for the police officers at Palmer Police Station, a sub-station of the Rio Grande precinct. Rodriguez was friends with several of the officers from Palmer Station, including Luis Carrasquillo–Morales

("Carrasquillo")[1] and defendant Carlos Flores–Moreira ("Flores"). Rodriguez visited the station almost daily. Many of the officers, when on patrol in the area, would visit the Rodriguez–Soto home for coffee or a drink. Flores and Rodriguez were particularly friendly; about once a week, during his patrol rounds, Flores would stop by the house for an hour's visit.

On Wednesday, April 17, 1991, Rodriguez struck Soto about her face and neck, bruising her, and called her insulting names. When Rodriguez fell drunkenly asleep, Soto gathered the children and went to her mother's house. Soto's mother, Hipolita Vega, convinced her to go to the police and file a complaint. In nine years of beatings, some of them worse than the one on April 17, Soto had never sought help because she believed that the police would do nothing, because she had nowhere to go, and because she was afraid of Rodriguez. Rodriguez had threatened her with a gun on several occasions and told her that he would kill her and other members of her family if she went to the police. Knowing that Rodriguez was friendly with the police, Soto feared that the police would do nothing except tell Rodriguez that she had complained.

On that night, despite her fear, Soto went with her mother and her children to the Palmer Police Station. When she arrived, she was met by Flores, who was the desk officer on duty. Flores could see that Soto was crying and marked with bruises, "pretty ugly hematomas." Soto explained that Rodriguez had beaten her. Flores then radioed for the patrol officers to come in and take her complaint, referring to Soto on the radio as "Rafi's wife" and saying that it was a Law 54 case. During the fifteen to twenty minutes that Soto and Flores waited for the patrol officers to arrive, Flores told Soto that he himself had domestic violence problems, and that his wife wanted him to be put in jail. He urged Soto to patch things up with Rodriguez. Soto responded by telling Flores that

Rodriguez's beatings were too much to stand and that, as Flores knew, Rodriguez was a heavy drinker, who became violent when drunk. Soto told Flores about everything that Rodriguez had done and what he would do to her. Flores offered Soto the opportunity to stay overnight at the station.

Sergeant Orta,[2] the supervisor, arrived, and Flores told him that Soto was "the lady with the Law 54 complaint." When the patrol officers, Carrasquillo and Jose Serrano, arrived, Flores said, "This is Rafi's wife," and told them that she was there on a Law 54 complaint. Carrasquillo took Soto into an interview room, three steps away from the desk at which Flores sat. Soto was nervous and crying. The door to the interview room remained open, and Flores listened to everything that was said in Soto's conversation with Carrasquillo.

In the interview room, Soto told Carrasquillo about Rodriguez's behavior, and showed him her bruises. Carrasquillo asked Soto whether she wanted Rodriguez jailed. Soto replied by explaining her situation to the officers. Specifically, she told Carrasquillo that Rodriguez had told her that if she put him in jail, he would get out quickly because his family had money and that he would then kill her. She told Carrasquillo that Rodriguez had told her that if she attempted to put him in jail, he would kill her mother and sisters so that she would go to the wake and he would then kill her there.

Having told the police officers about Rodriguez's threats, Soto asked them to do what was appropriate. Although Soto did not use the words "domestic violence complaint," she believed that by describing her situation to the officers she was initiating the complaint process. Carrasquillo wrote down everything she said during the interview, and Soto assumed that he was drafting a complaint against Rodriguez.

Soto's effort to get police assistance came a year and a half after a new law aimed at

1. Carrasquillo was originally named as a defendant in this action, but defaulted in the district court proceedings. In order to have a final judgment from which she could appeal, Soto sought and was granted a voluntary dismissal of her claim against Carrasquillo.

2. The district court denied a belated motion to add Sergeant Orta as a defendant. No appeal is taken from the denial of that motion.

curbing domestic violence had gone into effect. In November 1989, the Puerto Rican legislature enacted one of the nation's most comprehensive domestic violence laws, the Domestic Abuse Prevention and Intervention Act, known popularly as "Law 54." In addition to defining criminal domestic violence broadly, Law 54 makes arrest of an abuser mandatory whenever an officer has grounds to believe that Law 54 has been violated. P.R. Laws Ann. tit. 8, §§ 631–635, 638 (Supp. 1995). Police officers are required to take all steps necessary to prevent abuse from recurring, including providing the complainant with information about social services and, if she expresses concern for her safety, with transportation to a safe place. *Id.* § 640. Law 54 also requires that police officers file a written report on all domestic violence incidents, whether or not any charges are ever filed. *Id.* § 641. The police superintendent is charged with establishing "norms to guarantee confidentiality with regard to the identity of the persons involved in incidents of domestic violence." *Id.* Implementing regulations issued by the superintendent of police detail the officer's responsibilities, and instruct that arrest determinations are not to be affected by irrelevant factors, including victim reluctance. Rules and Procedures to Attend to Domestic Violence Incidents, Puerto Rico Police General Order No. 86–26m (Rev.1). The regulations explicitly state that police attempts at mediation or reconciliation shall not substitute for arrest. *Id.* at 4. The regulations require that domestic violence reports be kept confidential, in separate files, and that copies only be issued upon a court order. *Id.* at 19. These regulations explicitly recognize that:

> Domestic violence ... frequently ends in intra-family homicide and it affects all the

components of the family, including the children.

*Id.* at 1.

Despite this legal framework, at the conclusion of his interview with Soto, Carrasquillo took no action. Carrasquillo did not tell Soto about the availability of battered women's shelters or about procedures for obtaining an order of protection. Nor did he prepare a domestic violence report. Instead, Carrasquillo wrote up an "Other Services Report," which falsely indicated that Soto had visited the police solely for advice relating to child custody.[3] Soto returned to Vega's house.

Carrasquillo discussed Soto's complaint with his supervisor, Sergeant Orta, that evening. When Sergeant Orta signed the Other Services Report he did so despite information that this was a Law 54 situation and that the men under his supervision were not doing what the law required. Sergeant Orta discussed the "Other Services" report with Flores.[4] Flores told him that Rodriguez and Soto had marital problems because Rodriguez was an alcoholic. Flores said he would talk to Rodriguez the next day.

Sometime the next day, April 18, Officer Flores, despite knowing of Rodriguez's threats to commit murder if Soto went to the police in an effort to jail him, went to the Rodriguez–Soto home and told Rodriguez about Soto's visit to the police station. That night, Rodriguez arrived at Vega's home, very upset. He told Vega and Glorivee Soto, Soto's sister, that "the boys" from the police station had told him that Soto wanted to put him in jail and that he would not allow that to happen. Vega managed to calm him and he left.

The next day, Friday, April 19, Rodriguez ran into the plaintiff at a local tire shop. Rodriguez, visibly upset, told plaintiff that

---

**3.** Soto contends that she signed a domestic violence report at the station that night and that the Other Services Report produced by the defense is an after-the-fact forgery, and part of a cover-up, which included pressure on Flores to commit perjury. Her claim of forgery is supported by the testimony of a handwriting expert, and Flores's testimony suggests that pressure was put on him.

**4.** A police department internal investigation followed the killings. On August 31, 1992, the examiner concluded that Carrasquillo and Sergeant Orta, the supervisor who signed the Other Services Report prepared by Carrasquillo, merited reprimands for failing to act pursuant to the norms established by Law 54. Neither Betancourt–Lebron nor Flores was a subject of that investigation, although Flores was interviewed regarding his knowledge of the events.

Officer Flores had been to their home and had told him that Soto was going to throw him in jail. Soto, fearing violence, denied it. She tried to calm Rodriguez down, but Rodriguez kept repeating that Flores had told him she wanted him jailed.

On Saturday, the twentieth of April, Rodriguez again came to Vega's home and invited Soto to the beach. Soto refused to go, but the children, excited at the rare prospect of an outing with their father, got into the car. Rodriguez did not bring the children back that day as he had promised. Soto went twice to try to pick them up, but both times Rodriguez refused to give the children to her.

Finally, at 8:00 p.m. on April 21, Soto, mindful that the next day was a school day, went back to the family home determined to get the children. As she stood on the lawn, Soto heard both children tell Rodriguez that she had arrived. Sally shouted, "Run, Mommy, please run!" Rodriguez then shot his son in the forehead. Soto heard Sally say to her father, "Daddy, no, Daddy, no." Rodriguez then shot Sally through her mouth. Soto heard a third shot. Rodriguez had killed himself. When the police, including Carrasquillo and Serrano, arrived, Rodriguez was dead. The children were still alive and the police rushed them to the hospital. Both children were dead on arrival.

On the wall of the room where Rodriguez shot his children, Rodriguez had written a message which confirmed that Flores had told him of Soto's visit to the police. The message said, among other things, "you left me, and Officer Flores knows it," and "Law 54, which is only a tool for women to make men do whatever they want, is not liberty."

## II. Procedural History

Soto's initial section 1983 complaint alleged that the acts and omissions of Officer Flores deprived her of her rights to due process and to equal protection of the laws. Additionally, she alleged that Superintendent Betancourt–Lebron was liable for his failure to properly train and supervise his subordinate officers.

After discovery, Flores and Betancourt–Lebron moved to dismiss, and, in the alternative, for summary judgment. In addition to arguing that Soto's claims lacked merit, the defendants asserted that they were entitled to the protections of qualified immunity. In an opinion dated January 20, 1995, the district court granted the motion for summary judgment. As to the due process claim, the court held that, because an individual may not bring a section 1983 action for deprivation of due process based on injury to a family member, the death of Soto's children did not give rise to a cognizable claim. *Soto v. Carrasquillo,* 878 F.Supp. 324, 327 (D.P.R.1995)(citing *Valdivieso Ortiz v. Burgos,* 807 F.2d 6, 7–10 (1st Cir.1986)). As to the equal protection claim, the court held that Soto had failed to adduce enough evidence on discriminatory intent and causation to defeat summary judgment. *Soto,* 878 F.Supp. at 331–32.

Soto requested reconsideration; as part of her motion, she asked for leave to amend her complaint to bring the action as a representative of her children. The district court treated the complaint as amended, but dismissed the claim on behalf of the children, holding it barred by *DeShaney v. Winnebago County,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The court accordingly denied Soto's motion for reconsideration. Soto appeals.

## III. The Section 1983 Claims

Soto presses two distinct claims. First, she alleges that the defendants' actions violated her and her children's rights to due process. Second, Soto asserts that the defendants had a custom or policy of providing less protection to victims of domestic violence than to victims of other assaults, that this was the result of gender discrimination, that this caused her injuries, and that defendants thus violated her right to equal protection. We consider each of these claims in turn.

■ A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law (including Puerto Rico law); second, the conduct must have worked a denial of rights secured by the Constitution or by federal law. *Martinez v. Colon,* 54 F.3d 980, 984 (1st Cir.), *cert.*

denied, —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995). The second element requires the plaintiff to prove not only a deprivation of federal right, but also that the defendant's conduct was a cause in fact of the alleged deprivation. *See Maldonado Santiago v. Velazquez Garcia*, 821 F.2d 822, 831 (1st Cir.1987)("Section 1983 imposes a causation requirement similar to that of ordinary tort law.").

## A. *The Due Process Claim*

Soto claims that the deaths of her children are attributable to the defendants' actions, and that those actions deprived both her and her children of what she terms a "substantive due process life interest." [5] We examine separately Soto's individual claim and her claim on behalf of her children.

### 1. *Soto's Individual Claim.*

■ The district court held that Soto, in her individual capacity, could not bring a due process claim based on injury to her children. *Soto*, 878 F.Supp. at 327. On appeal, Soto argues both that the district court erred in so holding and that the injury she complains of is not limited to the loss of the companionship of her children, but also comprehends the mental anguish she has suffered personally.

We review the district court's grant of summary judgment *de novo*. *Dominique v. Weld*, 73 F.3d 1156, 1158 (1st Cir.1996). We examine, viewing the record in the light most favorable to the nonmoving party, whether the district court correctly applied the substantive law and whether any disputed facts have the potential to change the outcome of the suit. *See Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995).

■ There is no absolute constitutional right to enjoy the companionship of one's family members free from all encroachments by the state. *See Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir.1986). "State action that affects the parental relationship only incidentally ... even though the deprivation may be permanent ... is not sufficient to establish a violation of a identified liberty interest." *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir.), *cert. denied*, 502 U.S. 879, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991). Thus, the death of a family member will not ordinarily give those still alive a cognizable due process claim under section 1983. *See Manarite v. Springfield*, 957 F.2d 953, 960 (1st Cir.)(child could not sue police for failure to prevent father's suicide), *cert. denied*, 506 U.S. 837, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992); *Valdivieso Ortiz*, 807 F.2d at 10 (stepfather and siblings had no cause of action where prison guards beat inmate to death). Here, the defendants' actions, despite the tragic outcome, were not specifically aimed at ending or affecting Soto's relationship with her children. Nor can Soto successfully distinguish her case from the cited precedents of this court by pointing to her own mental anguish. The question is not one of a degree of suffering, but whether the plaintiff can establish a violation of federal right. While Soto's loss was of enormous, heartbreaking magnitude, the Constitution does not protect against all harms. She herself was not deprived of a constitutionally protected interest, and she may not bring a section 1983 due process claim on her own behalf.

### 2. *Soto's Claim as a Representative of Her Children.*

In deciding Soto's motion for reconsideration, the district court granted Soto's request to amend her complaint so as to bring a claim as a representative of her children. The court then found that the children's claim was foreclosed by *DeShaney*, dismissed

---

5. Some victims of abuse have brought section 1983 claims alleging that official nonfeasance deprived them of *procedural* due process. *See, e.g., Meador v. Cabinet for Human Resources*, 902 F.2d 474, 476–77 (6th Cir.), *cert. denied*, 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990); *Coffman v. Wilson Police Dep't*, 739 F.Supp. 257, 263–66 (E.D.Pa.1990). In these cases, the plaintiffs argued that state law made certain protective processes mandatory, and thus created entitlements subject to due process protection against deprivation. *See, e.g, Coffman*, 739 F.Supp. at 263–64. However, from our reading of the record, Soto does not appear to make a procedural due process claim. Thus, we do not address whether the protective provisions of Law 54 create such an entitlement.

the claim and denied the motion for reconsideration of the due process claim.

■ Review of denial of a motion for reconsideration is for abuse of discretion. *See Air Line Pilots Ass'n v. Precision Valley Aviation, Inc.,* 26 F.3d 220, 227 (1st Cir. 1994). For purposes of this appeal, we consider Soto's complaint, as amended, to determine if the district court committed legal error in holding that Soto, as a representative of her children, failed to state a claim upon which relief could be granted. *See Cooter & Gell v. Hartmarx,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359 (1990) (district court abuses discretion when it makes error of law); *cf. Glassman v. Computervision Corp.,* 90 F.3d 617 (1st Cir. 1996)(in reviewing denial of leave to amend complaint, court considers whether complaint as amended would state cognizable claim).

Defendants argue, and the district court held, that any claim on behalf of Soto's children is barred by *DeShaney,* which held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. at 197, 109 S.Ct. at 1004. We agree that if Soto's argument were simply that Flores and his brother officers failed to protect her children from Rodriguez, it would clearly fail. *See, e.g, Pinder v. Johnson,* 54 F.3d 1169 (4th Cir.) (en banc) (rejecting due process claim based upon police failure to protect domestic violence victim), *cert. denied,* —— U.S. ——, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995); *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696 (9th Cir. 1988)(same).

However, Soto alleges more than a mere failure to protect. She claims, and her claim has support in the record, that Officer Flores visited Rodriguez at home and told him that Soto had been to the police station and wished to jail him. She further alleges that when he did so Flores was fully aware of how Rodriguez would likely react to this information, not only because Flores knew Rodriguez's character well, but also because Flores knew that Rodriguez had threatened to murder her and her family members if she went to the police and attempted to stop his abuse by having him jailed. Soto alleges that Flores misused information that he had obtained in an official capacity, and that this affirmative act rendered her children more vulnerable to the danger posed by Rodriguez and thus led to their deaths.

■ Soto alleges that Flores's conduct violated a duty of constitutional dimension owed to Soto's children. *DeShaney* clearly establishes that the state does not have a constitutional duty to protect its citizens from private violence. *DeShaney,* 489 U.S. at 197, 109 S.Ct. at 1004. However, in *DeShaney,* the Supreme Court also recognized a distinction between the case before it and other cases in which the state created the risk faced by the plaintiff:

> While the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. [By returning the plaintiff child to his abusive father, the State] placed him in no worse position than that in which he would have been had it not acted at all.

*Id.* at 201, 109 S.Ct. at 1006. The situation here arises from the state actor's affirmative acts, which played a part in creating the danger to the children and rendered them more vulnerable to harm. Soto thus contends that it falls outside the scope of *DeShaney,* in that it "implicates the alternate framework of § 1983 liability wherein a plaintiff alleges that some conduct by an officer *directly* caused harm to the plaintiff." [6] *Pinder,* 54 F.3d at 1176 n. * (emphasis in original); *see also Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir. 1993)("[T]hough an allegation simply that police officers had failed to act upon reports of

---

6. The distinction between duty-to-protect cases and danger-creation cases was colorfully described by the Seventh Circuit in *Bowers v. De Vito,* 686 F.2d 616 (7th Cir.1982). While holding that "there is no constitutional right to be protected by the state against being murdered by criminals or madmen," Judge Posner pointed out that "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, ... it is as much an active tortfeasor as if it had thrown him into a snake pit." *Id.* at 618.

**1064**

past violence would not implicate the victim's rights under the Due Process Clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights.").

Not every negligent, or even willfully reckless, state action that renders a person more vulnerable to danger "take[s] on the added character of [a] violation[ ] of the federal Constitution." *Monahan v. Dorchester Counseling Ctr., Inc.,* 961 F.2d 987, 993 (1st Cir.1992). In a creation of risk situation, where the ultimate harm is caused by a third party, courts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and action. *See id.; Pinder,* 54 F.3d at 1175–78.

The scope of any permissible section 1983 action based on a state-created danger theory is a difficult question. *See, e.g., Pinder,* 54 F.3d at 1175; *Monahan,* 961 F.2d at 993–94. Because we find that this claim may be resolved on immunity grounds, we choose not to reach this question.

### 3. *Qualified Immunity.*

Assuming arguendo that Soto had stated a claim that Flores and Betancourt–Lebron violated her children's constitutional rights, the issue becomes whether the defendants are entitled, as they argue, to qualified immunity from suit. There are two prongs to qualified immunity analysis. *See St. Hilaire v. Laconia,* 71 F.3d 20, 24 (1st Cir.1995). First, the court must determine, as a matter of law, whether the constitutional right in question was clearly established at the time of the alleged violation. *Id.* If the right is clearly established, the court must then ask whether a reasonable similarly situated officer "should have understood that the challenged conduct violated" that right. *Id.*

To begin, Soto's arguments against qualified immunity appear to misconstrue the doctrine. Soto argues, with evidentiary support, that not only did the defendants violate Law 54 and the pertinent regulations, but also that they knew or reasonably should have known that they were violating it. According

to Soto, "[n]o good faith defense is possible if the official knew he was violating plaintiff's rights."

The Supreme Court has considered, and rejected, this approach to qualified immunity. *Davis v. Scherer,* 468 U.S. 183, 193–95, 104 S.Ct. 3012, 3018–19, 82 L.Ed.2d 139 (1984). In *Davis,* the plaintiff argued that official conduct that contravened a statute or regulation could not be objectively reasonable because officials may reasonably be expected to conform their conduct to legal norms. *Id.* at 193, 104 S.Ct. at 3018. The Court rejected this approach because it would "disrupt the balance ... between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Id.* at 195, 104 S.Ct. at 3019. "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Id.* at 194, 104 S.Ct. at 3019; *see also Borucki v. Ryan,* 827 F.2d 836, 847 n. 18 (1st Cir.1987). Accordingly, Soto's arguments with regard to Law 54, even if her alleged facts are true, do not resolve the qualified immunity question. The focus is rather on whether there is clearly settled law on the constitutional violation at issue.

This inquiry is sharpened by two narrowing principles. The right must be stated with sufficient particularity so that a " 'reasonable officer would understand that what he is doing violates that right' " and the right must have been "clearly established at the time of the defendants' alleged improper actions, and ... not ... through the use of hindsight." *Souza v. Pina,* 53 F.3d 423, 425 (1st Cir.1995) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). The issue is thus whether the constitutional duty not to affirmatively abuse governmental power so as to create danger to individuals and render them more vulnerable to harm was clearly established in April 1991, the time of the events giving rise to this suit.

What the Third Circuit termed the " 'state-created danger theory,' " *Kneipp v. Tedder,* 95 F.3d 1199, 1201 (3d Cir.1996), has been recognized by some federal courts as a viable

mechanism for establishing a constitutional claim at least since 1979. *See White v. Rochford,* 592 F.2d 381, 383 (7th Cir.1979) (finding Due Process Clause violation where "unjustified and arbitrary refusal of police officers to lend aid to children endangered by the performance of official duty ... ultimately result[ed] in physical and emotional injury to the children"); *see also Cornelius v. Town of Highland Lake,* 880 F.2d 348 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990); *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *Checki v. Webb,* 785 F.2d 534, 538 (5th Cir.1986). In *DeShaney,* the Supreme Court acknowledged that state actions that create dangers or render private citizens more vulnerable to harm could amount to constitutional violations. *See DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006. Since *DeShaney,* seven circuit courts of appeals have recognized that state-created dangers may, in proper circumstances, give rise to constitutional claims under section 1983. *See Kneipp,* 95 F.3d at 1208 (citing cases and tracing history of state-created danger theory).

While this history would appear to militate in favor of finding that there is clearly established law in this area, in 1991 the First Circuit had not yet addressed the issue of state-created dangers. The first case from this court to discuss the contours of that doctrine was *Monahan v. Dorchester Counseling Ctr., Inc.,* 961 F.2d 987 (1st Cir.1992), and that case held that, on the facts alleged, there was no constitutional violation. Of course, a violation of clearly settled law may be found even where the Supreme Court and the circuit in question have not specifically addressed the question. *See* 2 Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983,* § 8.07, at 134–35 (3d ed.1991) (citing cases).

However, we cannot extract a clearly established right from a somewhat confusing body of caselaw through the use of hindsight, or "permit claims of qualified immunity to turn on the eventual outcome of a hitherto

problematic constitutional analysis." *Martinez Rodriguez v. Colon Pizarro,* 54 F.3d 980, 989 (1st Cir.1995). The history of the state-created danger theory, although recently comprehensively described by the Third Circuit in *Kneipp,* is an uneven one. The distinction between affirmatively rendering citizens more vulnerable to harm and simply failing to protect them has been blurred. Moreover, courts have sometimes found that a given action, while rendering the plaintiff more vulnerable to danger, did not amount to a constitutional violation, but instead should be viewed as a state law tort. *See, e.g., Cannon v. Taylor,* 782 F.2d 947, 950 (11th Cir.1986). It is more recent judicial opinions that have begun to clarify the contours of this doctrine. *See, e.g., Kneipp,* 95 F.3d at 1208–10; *Pinder,* 54 F.3d at 1174–1177.

We conclude therefore that, in 1991, "the contours of the right were [not] sufficiently plain that a reasonably prudent state actor would have realized not merely that his conduct might be wrong, but that it violated a particular constitutional right." *Martinez Rodriguez,* 54 F.3d at 988. Accordingly, we find that the defendants are entitled to the protections of qualified immunity, and affirm the district court's grant of summary judgment on plaintiff's substantive due process claim.

## B. *The Equal Protection Claim*

In *DeShaney,* the Supreme Court acknowledged that "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." 489 U.S. at 197 n. 3, 109 S.Ct. at 1004 n. 3.

Soto alleges an equal protection violation in her assertion that "[d]efendants have a custom, policy and practice of treating complaints from, or on behalf of, women threatened with violence in domestic disputes differently from other complaints of violence. Defendants have discriminated on the basis of the sex of the complaining victim." The district court measured Soto's equal protection claim [7] under the standard for such

---

7. The district court correctly found that *Valdivieso Ortiz*'s bar on section 1983 actions for due

process violations based on the death of a family

claims brought by domestic violence victims that was first articulated by the Tenth Circuit in *Watson v. City of Kansas City*, 857 F.2d 690 (10th Cir.1988), and subsequently adopted by several other circuits. Under the *Watson* standard, a plaintiff seeking to defeat a motion for summary judgment must:

> proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom.

*Ricketts v. City of Columbia*, 36 F.3d 775, 779 (8th Cir.1994) (citing *Watson*, 857 F.2d at 694), *cert. denied,* —— U.S. ——, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995).

The district court found that Soto had adduced sufficient evidence to create a genuine issue as to whether the police force had a custom or policy of providing less protection to victims of domestic violence than to other assault victims. *Soto*, 878 F.Supp. at 329. We agree. The court also found that plaintiff had failed to meet her burden in opposing summary judgment[8] on either the discriminatory intent prong or the causation prong of the *Watson* standard. *Id.* at 332.

 In a matter of first impression for this court, we adopt the *Watson* standard for section 1983 equal protection claims brought by domestic violence victims. Several other circuits have considered similar claims. These tragedies follow a sadly similar pattern; an abuse victim, after repeatedly seeking police protection from her abuser, is gravely injured or killed. The victim, or her next of kin, claims under section 1983 that law enforcement policies provide lesser pro-

tection to victims of domestic violence and discriminate on the basis of gender. *See, e.g,* *Navarro v. Block*, 72 F.3d 712 (9th Cir.1995); *Eagleston v. Guido*, 41 F.3d 865 (2d Cir. 1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995); *Ricketts*, 36 F.3d at 775; *Brown v. Grabowski*, 922 F.2d 1097 (3d Cir.1990), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *McKee v. City of Rockwall*, 877 F.2d 409 (5th Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 727, 107 L.Ed.2d 746 (1990); *Watson*, 857 F.2d at 690.

Under the standard we adopt today, Soto must show that there is a policy or custom of providing less protection to victims of domestic violence than to victims of other crimes, that gender discrimination is a motivating factor, and that Soto was injured by the practice. *See Watson*, 857 F.2d at 694. Soto has adduced evidence sufficient to create an issue as to whether there was a custom or policy of providing less protection to domestic violence victims. Closer questions are whether Soto adduces evidence sufficient to permit the drawing of the necessary inference of an *intent* to discriminate against women and whether Soto provides sufficient evidence that her injuries were *caused* by the alleged custom or policy.

Soto's argument may be summarized as follows: (1) that the Preamble to Law 54 explicitly recognizes that "women are usually the victims of ... conjugal abuse" and that Law 54 expresses a legislative intent to protect women and children from domestic violence;[9] (2) that, although 95% of domestic violence complaints involve females as victims and males as perpetrators, one out of every four persons in jail in Puerto Rico for domestic violence is female;[10] (3) that state-

---

member has not been extended to equal protection claims. *Soto*, 878 F.Supp. at 328 n. 6.

8. It was part of Soto's prima facie case to proffer sufficient evidence of discriminatory intent. *See, e.g., Lipsett*, 864 F.2d at 896. In opposing summary judgment, it was Soto's burden to adduce sufficient evidence of that intent to create a trialworthy issue. *See National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743–44 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995).

9. Law 54 has been noted in academic literature for "its ambitious and comprehensive approach to domestic violence." *See* Rivera, *Puerto Rico's Domestic Violence Prevention and Intervention Law and the United States Violence Against Women Act of 1994: The Limitations of Legislative Responses*, 5 Colum. J. Gender & L. 78, 80 (1995). Rivera also describes how official resistance to Law 54 has been an impediment to implementation. *Id.* at 94–95.

10. While Soto admits that she presented no evidence of arrest rates for men charged with domestic violence as compared to arrest rates for

ments of the individual in charge of the police in Puerto Rico, Betancourt–Lebron, demonstrate both that Law 54 is not enforced as are other laws and that his disagreement with the law, which may reasonably be understood to be gender motivated, has led to non-enforcement by subordinate officers; (4) that there was no police training on domestic violence prior to the events at issue; (5) that statements by Sergeant Orta, and Officers Flores and Carrasquillo acknowledge that police officers in the Rio Grande precinct in 1991 did not enforce Law 54; (6) that statements by individual officers demonstrate gender bias and stereotyping, indicating that the Law was not enforced for discriminatory reasons; (7) that the non-discriminatory reasons offered for the non-enforcement are pretextual; (8) that differential enforcement of Law 54 therefore permits an inference of an intent to discriminate; and (9) that her injuries were caused by the non-enforcement of the domestic violence law.

▇▇▇▇ Defendants argue that no intent to discriminate can be inferred from mere non-enforcement of a law. It is a truism that under current Equal Protection Clause jurisprudence, a showing of disproportionate impact alone is not enough to establish a constitutional violation.[11] *See Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). While "impact provides an important starting point" for a court seeking to determine if the adverse effect reflects invidious gender-based discrimination, "purposeful discrimination is 'the condition that offends the Constitution.'" *Personnel Administrator v. Feeney*, 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979) (citation omitted) (upholding a veteran's preference in civil service hiring where 98% of veterans were male). "[T]he mere

existence of disparate treatment—even widely disparate treatment—does not furnish adequate basis for an inference that the discrimination was [impermissibly] motivated." *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1989); *see* Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2190–94 (1996)(modern doctrines of equal protection have encouraged the development of facially neutral policies that are difficult to challenge on constitutional grounds).

▇▇▇▇ A domestic violence victim seeking to prove an equal protection violation must thus show that the relevant policymakers and actors were motivated, at least in part, by a discriminatory purpose. *Feeney*, 442 U.S. at 274, 99 S.Ct. at 2293–94. The Supreme Court has defined discriminatory purpose as being:

> more than intent as volition or intent as awareness of consequences.... It implies that the decisionmaker ... selected or reaffirmed a course of action at least in part "because of," not merely "in spite of" its adverse effects upon an identifiable group.

*Id.* at 279, 99 S.Ct. at 2296.

Without the smoking gun of an overtly discriminatory statement by a decisionmaker, it may be very difficult to offer sufficient proof of such a purpose.[12] *See, e.g., Eagleston*, 41 F.3d at 878 (statistics showing that domestic violence complaints were less likely to result in arrest than were stranger assault complaints and evidence of under-enforcement of official domestic violence policy did not constitute evidence of discriminatory intent or purpose); *Ricketts*, 36 F.3d at 781 (although over 90% of victims of domestic abuse are women, and police statements offered support for discriminatory intent toward domestic disputes, plaintiff presented

women charged with domestic violence, she asserts that such comparisons are impossible because Puerto Rico has chosen not to gather this data.

11. "The Court's refusal to treat selective indifference as an equal protection violation suggests a preference for a stingy process theory over one that invites surreptitious introduction of impact analysis." Klarman, *An Interpretive History of Modern Equal Protection*, 90 Mich. L.Rev. 213, 299 (1991).

12. As the Third Circuit has recognized in the Title VII context, it is rare that discrimination wears its garb openly and it more often comes "masked in subtle forms." Triers of fact may recognize those more subtle forms for what they are and coded comments may raise inferences of discrimination. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir.1996).

no evidence of intent to discriminate against women). It is true, as Soto points out, that some courts have allowed the equal protection claims of domestic violence victims to proceed on an arguably lesser showing. *See Balistreri*, 901 F.2d at 701 (remark of officer that plaintiff's husband was entitled to hit her because she was "carrying on" suggested an animus against women sufficient to allow plaintiff's complaint to survive motion to dismiss); *Thurman v. City of Torrington*, 595 F.Supp. 1521, 1528–29 (D.Conn.1984)(viewing equal protection claim of domestic violence victim in terms of "increasingly outdated misconception" of husband's prerogative to discipline his wife) (internal quotation marks and citation omitted). However, we think that the stringent standards imposed by the majority of circuit courts are more in keeping with the Supreme Court's approach to equal protection challenges to facially neutral policies. It is in this light that we evaluate Soto's equal protection claim.

This is not the usual case in which plaintiffs seek to prove discriminatory intent from the mere fact of differential impact. Nor is this the more common case where a plaintiff in a civil rights action seeks to use the courts to upset the majoritarian preferences expressed through the legislative process. Rather, plaintiff here seeks the benefit of the protection afforded by that majoritarian legislative process and argues that she has been deprived of that protection by the actions of individual public officials motivated by a contrary, gender-discriminatory intent.

The statutory language of Law 54, and the legislative intent evident from its preamble, serve to differentiate this case from the typical disparate impact case. The Law's prefatory "Statement of Motives" states that:

> Although men as well as women may be victims of conjugal abuse, studies show that women are usually the victims of the aggressive and violent conduct that we call conjugal abuse.... The investigators figure that 60% of all married women in Puerto Rico are victims of conjugal abuse.

Statement of Motives, Domestic Abuse Prevention and Intervention Act, Act No. 54 (Aug. 15, 1989) (citation omitted). This recognition that the problem of domestic vio-lence impacts women most heavily is reiterated in the text of Law 54 itself:

> In developing the public policy on this matter, we must give attention to the handling of the difficulties that domestic abuse presents, *especially for women and children.*

P.R. Laws ann. tit. 8, § 601 (Supp.1995) (emphasis added). Law 54 also explicitly recognizes that discrimination has impeded institutional responses to domestic violence:

> Domestic abuse is one of the most critical manifestations of the effect of inequities in the relationships between men and women. The discriminatory ideas, attitudes, and conduct also *permeate those social institutions called upon to resolve and prevent the problem of domestic abuse and its consequences.* The efforts of these institutions to identify, understand and handle abuse have been limited, and often inadequate.

*Id.* (emphasis added).

In the more usual equal protection case, a plaintiff will present evidence of disparate impact upon a disfavored group in an attempt to provide an "important starting point" for proof of discriminatory intent. *See, e.g., Feeney*, 442 U.S. at 274, 99 S.Ct. at 2293. Here, the Statement of Motives of Law 54 contains an explicit legislative finding that domestic violence has a greater impact on women and the Law expresses an intent to ameliorate that impact. This legislative finding is evidence that under-enforcement of Law 54 would indeed have a greater impact on women and might therefore be motivated by gender discrimination.

Moreover, the express legislative desire to assist women victims of domestic violence and recognition of the problem of discrimination within responsible institutions are important factors to be considered in the "give and take" of the situation. *See Feeney*, 442 U.S. at 279 n. 24, 99 S.Ct. at 2296 n. 24 (discriminatory intent is often "made clear from what has been called ... 'the give and take of the situation'") (citation omitted). The Supreme Court has said that the discriminatory intent inquiry should look not only at the different impact a policy has on a

disfavored group, but also at the history behind the development of a policy, including looking at the problems it was intended to address. *See Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. at 564–65.

To the extent that decisions such as *Feeney* and *Arlington Heights* are rooted in an appropriate judicial deference to democratic processes and rational legislative preferences, the rationale of deference is less compelling here. *See, e.g., Feeney*, 442 U.S. at 271, 99 S.Ct. at 2292 ("The calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility.... [I]t is presumed that 'even improvident decisions will eventually be rectified by the democratic process ....' " (citations omitted)); *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563 ("[I]t is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality."). With Law 54, the legislature of Puerto Rico has expressed, through the democratic process, an intent to protect the female victims of domestic violence *and* has noted that enforcement agencies have been discriminatory and part of the problem. Thus, under-enforcement of Law 54 by those charged with administering the law may in fact be a subversion of majoritarian processes for individual, illegitimate motives. We believe, in this context, that action by officials leading to non-enforcement of Law 54 may be *some* evidence of discriminatory intent by those individuals. The policy Soto challenges is, of course, not Law 54, but the decision not to implement the Law when she sought its protections. In determining what, if anything, motivated that decision, the factfinder may consider the purposes of the Law itself, and draw appropriate inferences about what might motivate a decision not to effectuate those purposes. As the Law expressly seeks to aid women victims and eradicate institutional discriminatory attitudes, a decision not to implement the Law may well have been motivated not "in spite of," but "because of" the resulting impact on women. We review the record to see whether there is *sufficient* evidence of intent as to each of named defendants.

## 1. The Rio Grande Precinct

In reviewing whether the failure to enforce Law 54 was motivated by discriminatory intent, we look first to the actions of the officers in the Rio Grande precinct. The key actor at the precinct level was Sergeant Orta. Orta was told Soto was making a Law 54 complaint, yet he signed an Other Services Report in violation of Law 54 and took no steps to have Rodriguez arrested. Nor did he take any steps to remove Soto and her children from harm's way. He knew that Flores was going to talk to Rodriguez and did not try to stop him. He thus ratified and condoned the officers' disregard of Law 54.

Orta's statements, as described below, suggest a discriminatory attitude towards women; this attitude may have been one of the reasons behind the lack of enforcement of Law 54 at the Palmer substation of the Rio Grande precinct. Sergeant Orta made statements which a trier of fact could easily find reveal gender-discriminatory stereotypes and biases. He testified as follows:

Q: What is your opinion of Act 54?

A: I told you the first time, and I remit myself to the record, that I am in total disagreement with that Act. I believe that it is very unjust related to aggressions against women and I do not agree with that.

Q: Why do you believe it is very unjust with relation to aggressions against women?

A: Sometimes men, including myself of course, but sometimes one drinks on the outside or has a woman on the side or a friend on the side, and one has an argument with one's lady friend and goes home and takes it out on the wife. And I believe that is not just.

Q: Then I ask you, again, what is your opinion with relation to the law?

A: Well, the thing is that the law, in spite of it mentioning both parties as being able to complain, the woman is always the person who is injured. Credibility is given to

the woman, where there are occasions when that doesn't happen that way.

The weight to be given to Sergeant Orta's comments depends upon many factors. See *National Amusements*, 43 F.3d at 743 (ambiguous comments standing alone are insufficient to raise an inference of racial animus). The defendants here have not offered a plausible alternative interpretation for comments which in context suggest discrimination. *See Alexis v. McDonald's Restaurants, Inc.*, 67 F.3d 341, 348 (1st Cir.1995) ("[A] rational factfinder would be hard-pressed to glean a more plausible inference [than discriminatory intent], particularly since [defendant] has tendered no alternative interpretation supported by the present record."). The comments were made by a person whose actions allegedly contributed to the plaintiff's injury.

Sergeant Orta's statements are very troubling. His hostility to enforcing the domestic violence law could certainly be understood as arising from archaic stereotypes which assume that men enjoy certain prerogatives towards women, including beating them.[13] Gender-based "classifications may not be used, as they once were, to create or perpetuate the legal, social, and economic inferiority of women." *United States v. Virginia,* —— U.S. at ——, 116 S.Ct. at 2275 (citation omitted). Although Sergeant Orta is not a defendant here, he was a supervisor and his attitudes are evidence of whether the failure to enforce Law 54 at the precinct level was based on discrimination.

Law 54 was enforced sporadically, at best, in the precinct in 1991. Officer Flores testified that almost everyone in his police detachment "shied away from" Law 54 complaints. Asked what happened to the victims when the officers did not want to take complaints, Flores responded, "Well, they had to continue complaining." Flores testified that proper Law 54 procedures were followed only about 75% of the time, and then just by certain officers. Sergeant Orta, Flores's direct supervisor, stated that, despite Law 54, domestic violence complaints were not given great importance in 1991 and were commonly handled in the station as "Other Services" reports. There would certainly be enough facts to raise a reasonable inference that the failure to enforce Law 54 at the precinct level was based on gender discrimination.

That, however, does not answer the question as to whether Officer Flores, who is the defendant here, acted out of gender-based discriminatory intent in talking to Rodriguez. It was not within Flores's responsibilities to take Soto's complaint or to arrest Rodriguez. We find no evidence to suggest that Flores's motivation in talking to Rodriguez was based on gender discrimination. There is no evidence that Flores himself attempted to avoid enforcement of Law 54 at all, much less for discriminatory reasons. Flores, despite the lack of official training, undertook to get some training for himself. When Soto came to the Palmer substation, Flores called in the two patrol officers, whose responsibility it was to take the complaint and act on it. Flores described Soto's complaint as a Law 54 complaint to the patrol officers, as he did to Sergeant Orta. There is no evidence that Flores intervened and talked to Rodriguez because of a gender-discriminatory motive; rather, the relationship between the two men provides a strong inference that Flores believed his friendship could provide a basis to resolve the matter. Sadly, he was wrong.

---

**13.** "The Anglo–American common law originally provided that a husband, as master of his household, could subject his wife to corporal punishment or 'chastisement' so long as he did not inflict permanent injury upon her." Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy,* 105 Yale L.J. at 2118. This "right" of chastisement was recognized by Blackstone's Commentaries in the eighteenth century. 1 William Blackstone, *Commentaries* *444. A wife could turn to a court for protection through a writ of supplicavit. *Id.* The doctrine of chastisement was met with some disfavor and was not universally accepted in American legal culture.

*See* Tapping Reeve, *The Law of Baron and Femme; of Guardian and Child; of Master and Servant; and of the Power of Courts of Chancery* 65 (New Haven, Oliver Steele 1816); Siegel, *supra,* at 2124.

By the late nineteenth century, around the time of the enactment of the Equal Protection Clause, the doctrine of the right of chastisement had fallen into disrepute in America. The Supreme Judicial Court of Massachusetts expressly repudiated the doctrine in 1871. *Commonwealth v. McAfee,* 108 Mass. 458 (1871). Alabama repudiated the doctrine that same year. *Fulgham v. State,* 46 Ala. 143 (1871).

That he was wrong does not turn his action into one motivated by gender discrimination.

### 2. Police Superintendent Betancourt–Lebron

Plaintiff asserts that Betancourt–Lebron, the superintendent of police for the Commonwealth of Puerto Rico, should be held responsible because he failed to provide adequate training, and because that failure was due to gender-discriminatory bias.[14] This claim is based largely on Betancourt–Lebron's public statements. For example, when Law 54 had been in effect for eight months, Betancourt–Lebron, was quoted in the press as saying:

> I don't believe that [Law 54] is solving anything because it has not lessened the fights between husbands and wives. On the contrary, there is evidence that it continues to increase.

He went on to say that domestic violence should not be treated with laws that punish the aggressors, but with psychologists and social workers. This statement of disagreement with the law's decision to criminalize such conduct is not, in itself, a statement of discriminatory intent. Plaintiff posits that the statement in context should be read as discriminatory.

Soto's expert witness, Mercedes Rodriguez, opined that, because one of the most dramatic changes achieved by Law 54 was the criminalization of domestic violence, this statement by Betancourt–Lebron was "one of the most severe blows, that a public official of [his] stature" could give to the law. Rodriguez called these statements "a deviation on the part of the institutional leadership." It was the position of the Women's Affairs Commission that Betancourt's public statements "would promote rank and file's negative attitudes toward women victims and their rights under Law 54." The Superintendent's public statements, in opposition to a law he was charged with enforcing, were widely disseminated. It is reasonable to infer, as Soto's expert and the Women's Affairs Commission suggest, that they influenced many of the rank and file in the police. But that the statements had influence does not mean that they were motivated by discrimination.

Additionally, Betancourt–Lebron acknowledged that he foresaw that police officers would have problems implementing Law 54 because its procedures differed from other laws, and because "of active resistance from some members of the Force toward the law." There is no evidence, however, that he was aware of discriminatory attitudes at the Rio Grande precinct, much less that, in the face of such knowledge, he failed to act to curb those attitudes. Nor is there any comparative evidence as to what, if any, training Betancourt–Lebron implemented when other new laws went into effect. Evidence that Law 54, which was specifically intended to assist abused women, was handled differently than other new major law enforcement initiatives could, perhaps, support an inference of discriminatory intent. But the record is devoid of such evidence.

Somewhat more probative of Betancourt–Lebron's intent is his relationship with the Women's Affairs Commission. Betancourt–Lebron declined to meet, for a year after approval of Law 54, with the Women's Affairs Commission. Law 54 directs the Commission to evaluate implementation of the law and to promote the response of law enforcement agencies to victims. *See* P.R. Laws ann. tit. 8, § 651 (Supp.1995). The initial report of the Commission, covering the first year of implementation, noted: "Coordination with the Police of Puerto Rico to train personnel as to domestic violence problems and Law 54 has been virtually impossible." In fact, Betancourt–Lebron returned none of the numerous phone calls or letters to him from the Executive Director of the Commis-

---

**14.** We will assume arguendo, but do not decide, that there was evidence of a causal link between lack of training and the events at the precinct. The street level officers—Flores and Carrasquillo—both testified that they had not received formal training on Law 54, and were not even given a copy of the law. Both officers were left with understandings of the law that were flatly wrong. Both erroneously believed that the victim had to specifically request a Law 54 order, and that the victim had to sign a closed report if she did not wish to proceed to get a restraining order. Sergeant Orta also testified that he did not receive comprehensive training in Law 54 until 1993, two years after the incident at issue here.

sion, who was concerned about the Police Department's apparent lack of interest in implementing the law.

In the end, this evidence, while painting an unwholesome picture, is not enough to meet the strict standards imposed by the Supreme Court for showing discriminatory intent in equal protection claims. As *Feeney* says, the intent to be shown must be more than an "awareness of consequences." *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296. The defendant must have "selected ... a course of action at least in part 'because of' not merely 'in spite of' its adverse effects on an identifiable group." *Id.* An expression of disagreement with Law 54 and a failure to meet with the Women's Affairs Commission, while some evidence of discriminatory intent on the part of Betancourt–Lebron, is too slender a stalk on which to rest.

Thus, we conclude that plaintiff has fallen short of her difficult burden of proving discriminatory intent against these defendants as required to establish a constitutional tort. In so saying, we do not of course condone the actions and failures of duties we have described. The deaths of children, which may have followed from risks arguably created by the actions of public officials, are very serious matters. Whether this deplorable scenario is actionable under Puerto Rican law we leave, as we must, to others.

Accordingly, the grant of summary judgment against plaintiff is *affirmed.*

TORRUELLA, Chief Judge (concurring).

I concur with the majority's opinion. I am of the view that the District Court should be affirmed for substantially the same reasons and grounds as are stated in the opinion of the District Court.