## CATHERINE M. FORD *vs.* TOWN OF GRAFTON.

No. 96-P-1941.

Worcester. February 4, 1998. - May 8, 1998.

Present: KASS, SMITH, & FLANNERY, JJ.

*Massachusetts Tort Claims Act. Negligence,* Police, Municipality. *Governmental Immunity. Municipal Corporations,* Liability for tort, Police. *Police,* Negligence. *Civil Rights,* Immunity of public official. *Protective Order.*

A negligence claim brought against a town pursuant to G. L. c. 258, for a police department's repeated disregard of its responsibility to protect the plaintiff from her former husband against whom she had a G. L. c. 209A restraining order, was barred by the provisions of G. L. c. 258, § 20(*h*) and (*j*), as amended by St. 1993, c. 495, § 57, where the protective order did not constitute a specific and explicit assurance of safety within the meaning of § 10(*j*)(1) [723-725]; where the exception under § 10(*j*)(2) did not apply [725]; and where G. L. c. 209A contained no language that could create a cause of action under the saving clause of G. L. c. 258, § 10 [725-726].

Where a G. L. c. 209A protective order had expired at the time a victim was injured by her former husband, the victim could not maintain a claim under 42 U.S.C. § 1983, asserting that the protective order created a property interest in police enforcement and that the police department's failure to protect her violated her right to due process. [726-727]

A claim that a town's police department failed to protect the plaintiff from violence by a third person did not state a violation of substantive due process under the applicable principles set forth in *DeShaney* v. *Winnebago County Dept. of Social Servs.*, 489 U.S. 189 (1989). [727-728]

The record of proceedings on a claim under 42 U.S.C. § 1983, that a town's denial of police protection to the plaintiff, who had received a protective order under G. L. c. 209A, constituted a violation of her right to equal protection of the laws, did not demonstrate that the plaintiff was treated differently because of her membership in a certain class, and the judge correctly allowed the town's motion for a directed verdict. [728-730]

CIVIL ACTION commenced in the Superior Court Department on July 2, 1987.

The case was heard by *Diane M. Kottmyer,* J.

*Patrice C. Whalen* (*Elizabeth A. Fisher* with her) for the plaintiff.

*Leonard H. Kesten* for the defendant.

FLANNERY, J. A directed verdict was entered against the plaintiff at the close of her case-in-chief, and she appeals. We summarize the evidence from her perspective. See *Boyle* v. *Wenk,* 378 Mass. 592, 593 (1979); *Dobos* v. *Driscoll,* 404 Mass. 634, 656, cert. denied, 493 U.S. 850 (1989).

On October 18, 1984, Catherine M. Ford obtained a temporary protective order from the Worcester Probate and Family Court, pursuant to G. L. c. 209A. The order required that James Davidson, Ford's husband from whom she was separated,[1] (1) be prevented from imposing any restraint on her personal liberty and from abusing her; (2) stay away from 1 Birch Street, North Grafton, where Ford resided with her sister, Theresa Bowman, and her sister's husband; and (3) refrain from harassing Ford at her place of employment at Raytheon Company in Northborough.

On her way to the Grafton police station to get the protective order logged and posted, Ford stopped to speak with Officer David Glispin of the Grafton police at his home. She sought advice from Glispin on her situation, as he was a person she knew and an officer in town. Glispin told her that the situation with her husband was her problem. He stated that the police could not babysit her twenty-four hours a day. Rather, he advised her to buy a gun because the only way to deal with violence was violence.

On October 22, 1984, four days after the issuance of the protective order, Davidson attacked Ford when she left work. He dragged her from her vehicle and smashed her head against the car window, causing a concussion. The Northborough police arrived at the scene but advised Ford that Davidson could not be arrested for violating the protective order because he had not been served with the order. The police then served Davidson with the order and let him leave.

Ford was driven home from the scene by her sister and her sister's husband. She testified that her car was towed because Davidson had tampered with the vehicle so it would not start. She went from her home to the Grafton police department to report the attack. She was informed that nothing could be done because the incident had occurred in Northborough. Forty-five minutes later, Joanie Gervais, Ford's sister, called the Grafton

---

[1]The divorce of Ford from Davidson became final on March 5, 1985.

police department and reported that Davidson was at her parents' house threatening to kill Ford if the family did not let him see or speak to her. One Grafton police officer responded to the phone call and took the intoxicated Davidson into protective custody, as an incapacitated person, without speaking to any family member. Davidson was released the following morning.

On October 25, 1984, Ford's temporary protective order was extended to October 25, 1985. The Grafton police department received the court order and was aware of its provisions, despite its unexplained absence from the department's logs.

During the year the protective order was in force, Ford and her family received numerous death threats from Davidson. She continually reported these threats to the Grafton police but was repeatedly told that there was nothing the police could do until Davidson caused her physical harm. The police also told her that they were not a babysitting service and that the situation was her problem. They suggested that she get a gun or call the telephone company.

Ford attempted to protect herself from Davidson by changing departments at work and requesting that her employer tell Davidson she no longer worked there. She also stopped driving and traveled only from home to work and back, being driven by others. During this period, Ford's sisters also called the Grafton police dozens of times about the death threats. They too were told that the police could do nothing until Davidson actually hurt Ford.

The Grafton police department never arrested Davidson for violating the protective order, despite the reported complaints made by Ford and her family against Davidson. Specifically, on November 20, 1984, at approximately 11 P.M., one of Ford's sisters called the police and stated that she was concerned for Ford's safety because Davidson had called the house and the sister's husband was out of town. The police checked the area after receiving the telephone call. Two hours later, Ford called the police, reported that she had a restraining order against Davidson, and stated that he was driving an eighteen-wheel car carrier around the property at 1 Birch Street, had been peering in the windows of the house, and appeared to be drunk.

Officer Wayne Tripp responded to the call and told Ford that no action could be taken against Davidson unless the police actually observed him at 1 Birch Street. The Grafton police contacted authorities in Millbury and Shrewsbury, requesting

that they check on Davidson's ability to drive, but they made no request that he be detained for violating the protective order. The Millbury police stopped Davidson, determined that he was not driving under the influence, let him go, and informed Grafton of their actions.

On November 24, 1984, Ford's sister called the Grafton police and reported that Davidson repeatedly called her house from a bar in Worcester threatening to kidnap her infant children unless he was allowed to speak with Ford. Officer Glispin testified that he patrolled the immediate area of 1 Birch Street. However, neither Glispin nor any other member of the Grafton police department made any effort to locate Davidson. The police did not take out a complaint, seek an arrest warrant, or arrest Davidson for this incident.

On November 25, 1984, Ford received a telephone call from a psychiatrist at the University of Massachusetts Medical School who was treating Davidson. The psychiatrist warned Ford that he had a legal obligation to tell her that Davidson was threatening to kill her. She immediately contacted the Grafton police and relayed the doctor's concern. She was told that nothing could be done about the situation, although Officer Fenton made a notation in the police log. The Grafton police also received a forewarning call from the psychiatrist. Officer Fenton called Ford's sister, stated that she (the officer) was legally obligated to tell Ford of the threat, and asked that the information be relayed to her.

On January 10, 1985, Ford and a sister attended a clerk's hearing at the Westborough District Court. Both testified that the hearing involved a criminal complaint, previously filed by Ford without the assistance of the Grafton police, relating to Davidson's harassing phone calls. As the women left the courthouse, Davidson threatened to kill Ford. Ford and her sister proceeded directly to their parents' home. After they arrived, a telephone call was received from Davidson in which he stated that he was coming over if he was not permitted to talk to Ford. Ford hid inside the house.

Ford's sister called the Grafton police and informed them that Davidson had called the home, threatened to come over, and had arrived. The police were also told that Ford was in the home and that there was a restraining order against Davidson. Two officers came to the house. They spoke only to Davidson, advised him how to retrieve belongings he claimed were inside

the home, walked him off the property, and allowed him to drive off in his own vehicle. The police never spoke to Ford or anyone in her parents' home about the incident then or later.

On February 6, 1985, Ford contacted the Grafton police and told them that she had information that Davidson was trying to purchase a gun. The police logged the call but did nothing further. On the next day, Ford's sister called the Grafton police and complained that Davidson had been at 1 Birch Street and was going through the mailbox. This call was noted, without further action; the sister testified that the police told her to call the post office.

On March 5, 1985, the date of Ford's divorce from David-son, she agreed not to pursue a criminal complaint that she had caused to be issued against him for assault and battery. The complaint arose out of the October 22, 1984, attack on her at her place of employment. She testified that she agreed not to pursue the complaint out of fear and due to Davidson's assur-ances that he would move out of the area if she dropped the criminal matter. Davidson even provided her with a letter from his employer verifying that he had another job out of State.

Davidson did not relocate. Instead, he persisted in threatening Ford and violating the protective order. On April 25, 1985, while Ford was at 1 Birch Street, Davidson came through neighboring property and into the backyard. The Grafton police were called, and Officer Glispin responded to the complaint. Davidson, however, had already left the area. Glispin asked that police in Millbury, where Davidson lived, contact Davidson and tell him to go to the Grafton police department. Davidson ar-rived at the police department and, upon questioning, admitted to violating the protective order by being present at 1 Birch Street. Glispin testified that he told Davidson he was tired of him upsetting Ford and if Davidson bothered her in the future, Glispin would do his best to get him into court. He did not ar-rest Davidson for violating the protective order but told him he would be summonsed to court for the violation. Davidson was not summonsed until September 19, 1985, five months after the incident.

The prosecutor was not provided with any information regard-ing the history between Davidson and Ford. Moreover, Ford was not notified of any prosecution of Davidson, made aware of any court date, or summonsed to be a witness. She learned that Davidson was fined for the April 25, 1985, attack when she read about the court proceeding in a newspaper.

Ford began driving again in October, 1985, after not having done so for about a year. On October 25, 1985, after leaving a birthday party, she stopped at a traffic light where Davidson suddenly appeared and began pounding on her car. She testified that she went home, called the Grafton police to report the incident, and was told once more that there was nothing the police could do.

On October 25, 1985, the protective order expired. In November, 1985, Ford felt that she had disrupted her sister's family for over a year and she still feared that their lives were in danger. She moved into her own apartment up the street from 1 Birch Street. She also began making plans to move out of State because she thought her safety depended on her doing so.

Ford received her last death threat from Davidson just before January 17, 1986. She reported the threat to the Grafton police. On January 16, 1986, Davidson paid the fines related to his April 25, 1985, offense.

On January 17, 1986, at about 6 in the evening, after a ten-hour work day, Ford was in her kitchen making supper. She heard someone at the door and first thought it was her sister. She then realized the kitchen door was starting to break because Davidson was kicking it in. Ford ran out the front door, chased by Davidson. She ran in front of a car, but it did not stop. She went to a neighboring house and pounded on the door, but no one let her inside. As she ran to the next house, Davidson caught her and he said, "Where do you want it? You bitch, you're going to die." Then he shot her; she suffered three wounds to the face and neck, resulting in quadriplegia. Davidson then shot himself fatally.

On July 2, 1987, Ford sued the town of Grafton for the injuries she suffered in the January 17, 1986, shooting.[2] The complaint included claims for negligence, violations of her constitutional rights to due process of law and equal protection of the laws under 42 U.S.C. § 1983, and violations of her civil rights under G. L. c. 12, §§ 11H and 11I.[3] At trial, the judge ordered bifurcation of the case. Ford was to proceed with the liability portion of the case and postpone the presentation of evidence on damages, with the understanding that she might

---

[2]The complaint also named the town of Clinton as a defendant. The parties stipulated to the dismissal of Clinton pursuant to Mass.R.Civ.P. 41(a)(1)(ii), 365 Mass. 803 (1974).

[3]Ford did not proceed on her State civil rights claim.

recall witnesses to testify on damages. At the close of the liability part of her case, the town moved for a directed verdict on all claims. As noted, the motion was allowed, and Ford appeals.

1. *Negligence under G. L. c. 258.* The trial judge concluded, and we agree, that Ford's negligence claim, brought pursuant to G. L. c. 258, is based upon the town's failure to protect her. The evidence, taken in the light most favorable to the plaintiff, establishes that the town failed repeatedly to arrest Davidson despite its obligation to do so under G. L. c. 209A.[4] The town's disregard of its responsibility to arrest under the law, is alleged

---

[4]General Laws c. 209A, § 6, as amended through St. 1983, c. 678, § 4, defined the powers of the police to act when they had "reason to believe that a family or household member has been abused or is in danger of being abused." The statute, which has been further amended after 1983, required that the police use all reasonable means to prevent further abuse, including:

> "(1) remaining on the scene as long as there is immediate danger to the physical safety of such person without the presence of a law officer, including but not limited to staying in the dwelling unit for a reasonable period of time; (2) assisting such person in obtaining medical treatment necessitated by an assault, which may include driving the victim to the emergency room of the nearest hospital, or arranging for appropriate transportation to a health care facility, any law to the contrary notwithstanding; (3) giving such person immediate and adequate notice of his or her rights; (4) arresting any person whom the officer has probable cause to believe has committed a felony; (5) arresting any person who has committed, in the officer's presence, a misdemeanor which involves abuse; (6) *arresting any person whom the officer has probable cause to believe has committed a misdemeanor pursuant to section thirty-four C of chapter two hundred and eight or section seven of chapter two hundred and nine A.*" (Emphasis added.)

General Laws c. 209A, § 7, inserted by St. 1983, mandates that

> "[w]henever the court orders the defendant to refrain from abusing the plaintiff or orders the defendant to vacate the household under section three or four . . . [l]aw enforcement officers shall use every reasonable means to enforce such orders. Law enforcement agencies shall establish procedures adequate to insure that an officer on the scene of an alleged violation of such order may be informed of the existence and terms of such order. . . . Any violation of such order shall be punishable by a fine of not more than five thousand dollars or by imprisonment for not more than two and one-half years in the house of correction or both such fine and imprisonment. Each such order issued shall contain the following statement: VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE."

to be the proximate cause of Ford's injuries. The judge ruled that, despite this evidence of negligence, the town was immune from liability under G. L. c. 258, § 10(*h*), (*j*).

The Massachusetts Tort Claims Act, G. L. c. 258, allows recovery against governmental entities for those with valid tort claims. See *Lawrence* v. *Cambridge*, 422 Mass. 406, 408 (1996). Prior to the Supreme Judicial Court's decision in *Jean W.* v. *Commonwealth*, 414 Mass. 496 (1993), the court "had precluded liability for otherwise valid claims if the plaintiff could not establish a special relationship between himself and the public employee." *Lawrence* v. *Cambridge*, 422 Mass. at 408. In *Jean W.* v. *Commonwealth*, 414 Mass. at 499, the court announced its intention to abolish this so-called "public duty rule" and invited the Legislature "to respond to this anticipated change by passing additional limitations on liability." *Ibid.* The Legislature responded with an amendment of G. L. c. 258, § 10 (St. 1993, c. 495, § 57), adding "what in effect is a statutory public duty rule providing governmental immunity." *Carleton* v. *Framingham*, 418 Mass. 623, 627 (1994).[5] The sections of this amendment that are raised in the present case state:

> "The provisions of sections one to eight, inclusive, shall not apply to:
>
> . . .
>
> "(*h*) any claim based on the failure to establish a police department or a particular protection service, or if police protection is provided, for failure to provide adequate police protection, prevent the commission of crimes, investigate, detect or solve crimes, identify or apprehend criminals or suspects, arrest or detain suspects, or enforce any law, but not including claims based upon the negligent operation of motor vehicles, negligent protection, supervi-

---

[5]By St. 1993, c. 495, § 144, the amendment was to "apply to all claims upon which a final judgment has not entered, or as to which an appeal is pending or the appeal period has not expired, and to all claims upon which suit is filed after the effective date of this act." The retroactive application of the amendment withstood constitutional challenge in *Carleton* v. *Framingham*, 418 Mass. at 634. Therefore, although the present case was brought prior to the amendment, retroactive application is appropriate.

sion or care of persons in custody, or as otherwise provided in clause (1) of subparagraph (*j*).

. . .

"(*j*) any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer. This exclusion shall not apply to:

> "(1) any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances. A permit, certificate or report of findings of an investigation or inspection shall not constitute such assurances of safety or assistance; and

> "(2) any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention. . . .

"Nothing in this section shall be construed to modify or repeal the applicability of any existing statute that limits, controls or affects the liability of public employers or entities."

Ford argues that the trial judge erred in ruling that G. L. c. 258, § 10(*h*), (*j*), provides immunity to the town. She contends these provisions do not preclude her claim because (1) the town gave her direct assurances that she was receiving all the protection she was entitled to receive under G. L. c. 209A and she was injured as a result; (2) the town intervened in her case and, therefore, caused her injury or enhanced her vulnerability to Davidson's threats; and (3) G. L. c. 209A provided her with a claim against the town under the savings clause of G. L. c. 258, § 10.

While the town's negligence reasonably could be inferred from the evidence, we are bound by the Legislature's explicit

choice to immunize the town in the circumstances of this case. Section 10(*h*) specifically bars claims based on the "failure to provide adequate police protection, prevent the commission of crimes, investigate, detect or solve crimes, identify or apprehend criminals or suspects, arrest or detain suspects, or enforce any law." "Aside from its exceptions . . . clause (*h*) seeks to immunize a municipality when the criminal acts of a third person are a cause of a plaintiff's harm, and the police were negligent in not preventing that criminal conduct." *Carleton* v. *Framingham*, 418 Mass. at 629. Therefore, while the town might have prevented Ford's injuries, its failure to do so is excluded from liability under the statute. Contrast *Brum* v. *Dartmouth, ante* 318 (1998).

Section 10(*j*)(1) is the relevant statutory exception to police immunity conferred by § 10(*h*). The § 10(*j*)(1) exception applies when the claim is based "upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances." Ford argues that the town is liable under § 10(*j*)(1) because it gave her direct assurances that she was receiving all the protection she was entitled to receive under G. L. c. 209A, and she was injured as a result of her reliance on those assurances. Moreover, Ford urges here, as below, that the act of the Legislature in enacting G. L. c. 209A — a statute of general applicability — and the act of the court in issuing her a protective order constitute an assurance of safety or assistance by individuals in the town's police department.

Not so. Subsection (*j*)(1) does not define the terms "explicit" or "specific" assurances, but the Supreme Judicial Court has interpreted the words in accordance with their plain meaning. See *Lawrence* v. *Cambridge*, 422 Mass. at 410. The court recognized the similarity in the meaning of the words but clearly stated the differences:

> "[W]e believe that by 'explicit' the Legislature meant a spoken or written assurance, not one implied from the conduct of the parties or the situation, and by 'specific' the terms of the assurance must be definite, fixed, and free from ambiguity."

*Ibid.* The town may have given Ford and her family explicit and specific assurances, but the assurances were not of safety or assistance. Compare *id.* at 411-412 (genuine issue of material fact whether the city's promise to protect the plaintiff when he closed his store at night was explicit and specific assurance of safety or assistance so as to fall within the provisions of G. L. c. 258, § 10[*j*][1]). To the contrary, the town assured Ford and her family it could not take any action until it saw Davidson violating the protective order or he actually caused Ford harm. Further, there was testimony that the police told Ford they were not her babysitting service and advised her to get a gun for protection. Accordingly, we conclude the evidence precludes a finding that the town gave "explicit and specific assurances of safety or assistance" to the victim or her family.

Ford next argues that § 10(*j*)(2) provides an exception to the town's immunity. She contends the town's intervention caused injury or enhanced her vulnerability to Davidson's threats. The town's alleged negligent intervention is based on its failure to investigate, detect crime, apprehend, arrest, and enforce the law. The intervention is not based on collateral negligence in the course of any one of these police functions.[6] See Glannon, Liability for "Public Duties" Under the Tort Claims Act: The Legislature Reconsiders the Public Duty Rule, 79 Mass. L. Rev. 17, 19, 24 (1994) (providing examples of claims based on collateral police negligence that § 10[*h*] does not immunize). Ford's claim is within the § 10(*h*) exclusion for police protection activities. Accordingly, we are bound to consider only the specific limitations to this exclusion enumerated by the Legislature, i.e., those contained in § 10(*j*)(1); the limitations in § 10(*j*)(2) are not enumerated.

Lastly, Ford argues that G. L. c. 209A provides her a claim against the town pursuant to the last paragraph of § 10. Again, this clause states: "Nothing in this section shall be construed to modify or repeal the applicability of any existing statute that limits, controls or affects the liability of public employers or entities." Ford contends that the town's disregard of the language of G. L. c. 209A, which requires police officers to ar-

---

[6]In her reply brief, Ford attempts to separate her claim from § 10(*h*) by arguing that it is based on the town's misrepresentation of her rights under G. L. c. 209A. While we agree that this argument may support her reasons for failing to renew her protective order, we do not agree that this characterization of her claim removes it from the purview of § 10(*h*).

rest any person whom the officer has probable cause to believe has violated a protective order, renders the town liable as matter of law. We agree that G. L. c. 209A mandates police officers to act in accordance with the statute. However, we find no language in the statute that holds officers liable for failing to do so. Accordingly, G. L. c. 209A does not give Ford a claim against the town under the "saving clause" of G. L. c. 258, § 10.

2. *The § 1983 claims.* Ford argues three distinct claims under 42 U.S.C. § 1983. First, she contends the town violated her right to procedural due process of law by failing to provide the mandatory protections she was entitled to under G. L. c. 209A. Second, she maintains the town's acts violated her right to substantive due process. Finally, she argues the town violated her right to equal protection of the laws because it had a custom or policy of providing less protection to victims of domestic violence than to victims of other violence, that this was the product of class or gender discrimination, and that the custom or policy caused her injuries. The trial judge allowed the town's motion for a directed verdict on each claim, and we affirm.

Two elements are essential for a claim under § 1983. "First, the challenged conduct must be attributable to a person acting under color of state law . . . ; second, the conduct must have worked a denial of rights secured by the Constitution or by Federal law." *Soto* v. *Flores*, 103 F.3d 1056, 1061 (1st Cir.), cert. denied, 118 S. Ct. 71 (1997). This second prong "requires the plaintiff to prove not only a deprivation of federal right, but also that the defendant's conduct was a cause in fact of the alleged deprivation." *Ibid.*

a. *Procedural due process claim.* The United States Supreme Court, in *Board of Regents of State Colleges* v. *Roth*, 408 U.S. 564 (1972), held that property interests created by State law are afforded due process protection. These interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577.

Ford argues that her protective order created a property interest in police enforcement that is cognizable under *Roth*. See *Coffman* v. *Wilson Police Dept.*, 739 F. Supp. 257, 263-266 (E.D. Pa. 1990) (properly-served protective order issued pursuant to the Pennsylvania Protection From Abuse Act created special relationship between police and spousal abuse victim and, thus, created constitutionally protected "property interest" in police enforcement).

We question whether a protective order, properly served on the police department, creates a *Roth* property interest that is secured by due process of law. No Massachusetts court has determined that a protective order creates a special relationship between the police and a domestic violence victim and, thereby, provides a constitutionally-protected "property interest." We need not decide this issue, however, because Ford did not have a protective order against Davidson at the time of her injuries. If a court order gives rise to such an entitlement, its absence defeats the claim.[7]

b. *Substantive due process claim.* Ford argues the town violated her right to substantive due process under the Fourteenth Amendment to the United States Constitution by failing to protect her against Davidson's violence. The trial judge held this claim was precluded by the United States Supreme Court decision in *DeShaney* v. *Winnebago County Dept. of Social Servs.*, 489 U.S. 189 (1989).

In *DeShaney*, the Court concluded "that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. The Court recognized "that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. See, e.g., *Estelle* v. *Gamble*, 429 U.S. 97 (1976) (the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's due process clause, requires the State to provide adequate medical care to incarcerated prisoners); *Youngberg* v. *Romeo*, 457 U.S. 307 (1982) (substantive component of

---

[7]Ford argues that the expiration of her protective order does not preclude her claim because the claim is not limited to the right to police response on January 17, 1986. She contends her procedural due process claim is premised upon her right to have Davidson arrested for his repeated violations of the order and her right to have the town advise her of the contours of her entitlement to police protection. She claims the town's failure to provide her with the statutory protections throughout the term of the protective order, together with the misrepresentation of her rights, caused her to refrain from renewing the order and left her more vulnerable to Davidson's attack on January 17, 1986.

We conclude, after considering the evidence with all reasonable inferences drawn for the plaintiff, that even if the town deprived Ford of her property right during the term of the order, and that deprivation made her more vulnerable to Davidson's final attack, it was not the actual cause of her January 17, 1986, injuries.

Fourteenth Amendment due process clause requires the State to provide involuntarily committed mental patients with services necessary to ensure their "reasonable safety" from themselves and others).

The imposition of an affirmative duty occurs only "when the State takes a person into its custody and holds him there against his will." *DeShaney*, *supra* at 199-200. The rationale for this principle was stated:

> "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."

*Id.* at 200.

The town's actions fall outside the constitutionally proscribed conduct enunciated in *DeShaney*. Nothing in the evidence suggests that the town restricted Ford's liberty so as to give rise to an affirmative duty to protect. Ford argues that the evidence shows numerous acts by the town that enhanced her danger and, therefore, caused her injuries. While these acts may have rendered Ford "more vulnerable to danger in the sense that those acts may have exacerbated . . . [her injuries,] these are not the kind of 'affirmative acts' by the [town] that would give rise to a constitutional duty to protect." *Souza* v. *Pina*, 53 F.3d 423, 427 (1st Cir. 1995) (district attorney's comments to press encouraging the media to link murder suspect to killings did not violate due process rights of suspect who committed suicide, even if district attorney were aware of suspect's suicidal tendencies). See *DeShaney*, 489 U.S. 189 (State had no constitutional duty to protect child from his father after receiving reports of abuse, despite claim that special relationship existed between the child and the State).

c. *Equal protection claim.* Although there is no constitutional right to police protection, "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney* v. *Winnebago County Dept. of Social Servs.*, 489 U.S. at 197 n.3. Ford argues that the town's denial of protection to her,

as a domestic violence victim, constitutes an equal protection violation.

The standard applied to equal protection claims brought by domestic violence victims requires a showing of "a policy or custom of providing less protection to victims of domestic violence than to victims of other crimes, that gender discrimination is a motivating factor, and that the [victim] was injured by the practice." *Soto* v. *Flores*, 103 F.3d at 1066 (adopting standard articulated by the court in *Watson* v. *Kansas City*, 857 F.2d 690 [10th Cir. 1988], and subsequently adopted by several other Federal Circuit Courts of Appeals).

Ford argues that she introduced sufficient evidence to meet the standard. She contends that the town's custom or policy is established through (1) her own experience with the town since it included a series of contacts for over a year that ended in a "single brutal incident" sufficient to show that a violation took place; (2) the failure to train officers in domestic abuse; (3) G. L. c. 209A's mandate to protect domestic violence victims, which was repeatedly flouted by the town; (4) the preferential treatment given to an abuse victim in an unrelated, nondomestic case; and (5) the town's demeaning statements regarding Ford's marital status and requests for help.

As stated, an equal protection claim requires Ford to "demonstrate that she was treated differently because of her membership in a certain class." *Watson* v. *Kansas City*, 857 F.2d at 696. Deliberate indifference in Ford's case alone would be insufficient evidence of different treatment. *Ibid.* A plaintiff normally "must point to facts outside the plaintiff's own case to support the allegation of an unconstitutional municipal policy." *Id.* at 695 (plaintiff presented statistical evidence showing great disparity between arrests for nondomestic assault cases and arrests for domestic assaults). It is true that some courts have permitted equal protection claims to proceed on a lesser showing. See, e.g., *Balistreri* v. *Pacifica Police Dept.*, 901 F.2d 696, 701 (9th Cir. 1990) (police officer's comment that plaintiff's husband was entitled to hit her because she was "carrying on" suggested an animus against abused women sufficient to survive motion to dismiss). However, "the stringent standards imposed by the majority of circuit courts are more in keeping with the Supreme Court's approach to equal protection challenges to facially neutral policies." *Soto* v. ·*Flores*, 103 F.3d at 1068. We evaluate Ford's equal protection claim accordingly.

The evidence may establish deliberate indifference in Ford's case, but there is no showing of systematically different treatment by the town between domestic abuse cases and nondomestic abuse cases. Rather, Ford offers only the better treatment given to one female, nondomestic violence victim. In sum, the evidence offered fails to show a pattern that constitutes a custom or policy of selective enforcement.

Moreover, even if the evidence established such a custom or policy, it would not necessarily establish the town's intent to discriminate against women and/or victims of domestic violence. "[T]he mere existence of disparate treatment — even widely disparate treatment — does not furnish adequate basis for an inference that the discrimination was [impermissibly] motivated." *Soto* v. *Flores*, 103 F.3d at 1067, quoting from *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989). A domestic violence victim seeking to prove an equal protection violation must show that the police were motivated by a discriminatory purpose. Discriminatory purpose has been defined by the United States Supreme Court as being:

> "more than intent as volition or intent as awareness of consequences. . . . It implies that the decisionmaker . . . selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group."

*Soto* v. *Flores*, 103 F.3d at 1067, quoting from *Personnel Administrator of Mass.* v. *Feeney*, 442 U.S. 256, 279 (1979).

We conclude that the evidence, "while painting an unwholesome picture, is not enough to meet the strict standards imposed by the Supreme Court for showing discriminatory intent in equal protection claims." *Soto* v. *Flores*, 103 F.3d at 1072.

3. *Conclusion.* As the Court recognized in *DeShaney* v. *Winnebago County Dept. of Social Servs.*, 489 U.S at 202-203, "[j]udges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [Ford] to receive adequate compensation for the grievous harm inflicted upon [her]." Before yielding to that impulse, we must remember that we are bound by our Constitutions and laws. The people of Massachusetts may choose by legislation to hold towns and their officials accountable in situations like this one. Also as recognized in *DeShaney, supra* at 103, however, "they should

not have [accountability] thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment," nor by the equal protection clause or G. L. c. 258.

*Judgment affirmed.*