# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
October 5, 2021

Lyle W. Cayce
Clerk

No. 19-30702
CONSOLIDATED WITH
No. 19-30989

PRISCILLA LEFEBURE,

*Plaintiff—Appellee*,

*versus*

SAMUEL D'AQUILLA, 20TH JUDICIAL DISTRICT, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:17-CV-1791

ON PETITION FOR REHEARING EN BANC

Before OWEN, *Chief Judge*, and GRAVES and HO, *Circuit Judges*.
JAMES C. HO, *Circuit Judge*:

Treating the Petition for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is denied. No member of the panel nor judge in regular active service of the court having requested that

No. 19-30702
c/w No. 19-30989

the court be polled on Rehearing En Banc (FED. R. APP. P. and 5TH CIR. R. 35), the Petition for Rehearing En Banc is denied.

We withdraw the court's prior opinion of February 9, 2021, and substitute the following opinion.

\* \* \*

If anyone deserves to have her day in court, it is Priscilla Lefebure. The allegations in her complaint are sickening: Barrett Boeker, her cousin's husband, raped and sexually assaulted her on multiple occasions at his home on the grounds of the Louisiana state prison where he serves as an assistant warden. Boeker then conspired with the district attorney, Samuel D'Aquilla (as well as his own counsel, who happens to be a relative of D'Aquilla's), to ensure that he would not be investigated or prosecuted for his crimes. In response, Lefebure filed this suit against D'Aquilla (as well as Boeker and others) on various constitutional and statutory grounds.

It is difficult to imagine anyone who deserves justice more than Priscilla Lefebure. But her claim against D'Aquilla runs into a legal obstacle that the panel has no discretion to ignore. Supreme Court precedent makes clear that a citizen does not have standing to challenge the policies of the prosecuting authority unless she herself is prosecuted or threatened with prosecution. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 617–19 (1973).

Under this established principle of standing, each of us has a legal interest in how *we* are treated by law enforcement—but not a legally cognizable interest in how *others* are treated by law enforcement. So people accused of a crime have an obvious interest in being treated fairly by prosecutors. And victims of crime have a strong interest in their own physical safety and protection. But victims do not have standing based on whether *other* people—including their perpetrators—are investigated or prosecuted.

2

Every court to have addressed this question prior to this case agrees that a crime victim may not challenge a prosecutor's failure to investigate or prosecute her perpetrator. Neither Lefebure nor the amicus brief filed in her support cite any authority to the contrary. In sum, we have no choice but to reverse and remand with instructions to dismiss the complaint for lack of subject matter jurisdiction as to D'Aquilla.

## I.

We accept, as we must at the motion to dismiss stage, the allegations contained in Lefebure's complaint as true. They are as follows:

Forced to evacuate her home in Baton Rouge due to flooding, Lefebure resided temporarily with her cousin and her cousin's husband, Boeker. Their home is located on the grounds of the Louisiana State Penitentiary, where Boeker serves as an assistant warden.

Boeker raped and sexually assaulted her on multiple occasions there. First, he raped her in front of a mirror, where he made her watch, while telling her that no one would hear her scream. Later, he sexually assaulted her with a foreign object, after picking the lock of the room where she was attempting to hide. Afterward, she tried to lock the door again, but he again proceeded to pick the lock and blocked her escape.

A few weeks later, Boeker was arrested for second degree rape. But no indictment was ever brought.

That's because, shortly after his arrest, Boeker met on multiple occasions with D'Aquilla, the district attorney for Louisiana's 20th Judicial District, along with Boeker's defense counsel, a relative of the district attorney, and Austin Daniel, West Feliciana Parish Sheriff. At those meetings, they conspired to protect Boeker from investigation and

prosecution. They agreed that Boeker was telling the truth and that Lefebure was lying.

Furthermore, Boeker falsely represented to others that he was being investigated by D'Aquilla and Daniel, according to the complaint, "so as to hide the conspiracy and ensure he would not face criminal liability for raping Ms. Lefebure."

Lefebure filed suit against D'Aquilla and the others, seeking damages and declaratory and injunctive relief. With respect to D'Aquilla, she brought various claims under (1) the Equal Protection Clause of the Fourteenth Amendment, as well as Article I, Section 3 of the Louisiana Constitution (Right to Individual Dignity); (2) the Due Process Clause of the Fourteenth Amendment, as well as Article I, Section 2 of the Louisiana Constitution (Right to Due Process); (3) 42 U.S.C. §§ 1983 and 1985 for civil conspiracy to violate civil rights; and (4) 42 U.S.C. § 1983 for abuse of process.

D'Aquilla filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, and asserted various defenses.

The district court granted in part and denied in part D'Aquilla's motion to dismiss. *Lefebure v. Boeker*, 390 F. Supp. 3d 729, 768 (M.D. La. 2019). It denied the motion to dismiss under Rule 12(b)(1), finding that Lefebure had standing. *Id.* at 746. It also dismissed some of her claims, and rejected many of D'Aquilla's asserted defenses as to her other claims. *Id.* at 747–50, 758, 763, 767–68.

The district court certified the order for interlocutory appeal under 28 U.S.C. § 1292(b). D'Aquilla moved in this court for leave to appeal from the interlocutory order. This court granted the motion.

No. 19-30702
c/w No. 19-30989

On appeal, counsel for Lefebure declined multiple opportunities to file a response brief. Counsel made four requests to extend the briefing deadline, between June and August 2020. This court granted each of those requests. After all those deadlines came and went, this court gave counsel further opportunity to file a brief out of time within ten days. Counsel declined to respond to our request or file a brief in this appeal, so the case was submitted with only D'Aquilla's brief. Counsel's failure to submit a brief "does not preclude our consideration of the merits" of D'Aquilla's appeal. *Hager v. DBG Partners, Inc.*, 903 F.3d 460, 464 (5th Cir. 2018). It merely forfeits the appellee's right to oral argument. *See* Fed. R. App. P. 31(c) ("An appellee who fails to file a brief will not be heard at oral argument unless the court grants permission.").

Following our initial decision in this case, counsel apologized for his previous oversights and sought rehearing en banc, supported by an amicus brief by three retired federal judges led by Alex Kozinski.

We review questions of subject matter jurisdiction de novo. *Jones v. United States*, 625 F.3d 827, 829 (5th Cir. 2010). We now withdraw our earlier opinion in this matter and substitute this opinion in order to explain why the arguments presented in the petition for rehearing en banc and amicus brief are foreclosed to this court as a matter of Supreme Court precedent.

## II.

"Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact.'" *Id.* "Second, there must be a causal connection between the injury and the conduct complained of." *Id.* "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed

by a favorable decision.'" *Id.* at 561 (quoting *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 43 (1976)).

Lefebure seeks to hold the prosecutor accountable for injuries she suffered from her assailant. No one doubts, of course, that crime victims suffer an injury in fact. *See Linda R.S.*, 410 U.S. at 618 ("appellant no doubt suffered an injury"). And Lefebure suffered one of the most horrific crimes imaginable. But longstanding Supreme Court precedent confirms that a crime victim lacks standing to sue a prosecutor for failing to investigate or indict her perpetrator, due to lack of causation and redressability. *See id.* ("the bare existence of an abstract injury meets only the first half of the standing requirement").

As Justice Marshall wrote for the Court in *Linda R.S.*, even "if appellant were granted the requested relief, it would result *only* in the jailing of the child's father." *Id.* at 618 (emphasis added). As the majority concluded, it is "only speculative" that "prosecution will . . . result in [the deterrence of crime]"—"[c]ertainly the 'direct' relationship between the alleged injury and the claim sought to be adjudicated . . . is absent." *Id.* Accordingly, "[t]he Court's prior decisions consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* at 619.

In reaching this holding, the Court repeatedly emphasized "the special status of criminal prosecutions in our system." *Id. See also*, *e.g.*, *id.* at 617 (noting "the unique context of a challenge to a criminal statute"). It is a bedrock principle of our system of government that the decision to prosecute is made, not by judges or crime victims, but by officials in the executive branch. And so it is not the province of the judiciary to dictate to executive branch officials who shall be subject to investigation or prosecution. As the Supreme Court has unanimously observed, "the

Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974) (citing cases). Chief Justice Roberts has likewise noted that "[o]ur entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed, not one private citizen against another." *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 278 (2010) (Roberts, C.J., dissenting from dismissal of the writ of certiorari as improvidently granted). "The terrifying force of the criminal justice system may only be brought to bear against an individual by society as a whole, through a prosecution brought on behalf of the government." *Id.* at 273.

The standing analysis in *Linda R.S.* reinforces this constitutional allocation of power among the branches of government. The requirement of standing under Article III of the Constitution is, of course, a doctrine that is itself based on the separation of powers. "The law of Article III standing . . . is built on separation-of-powers principles," for it "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). *See also Raines v. Byrd*, 521 U.S. 811, 820 (1997) (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)) ("[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers.").

In short, it is not the province of the judiciary to dictate prosecutorial or investigative decisions to the executive branch. And if that is so, then it is understandable why plaintiffs would lack standing to seek judicial review of such executive decisions, as the Court held in *Linda R.S. See*, *e.g.*, 410 U.S. at 619 (invoking fundamental principles of "American jurisprudence" to explain why "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another").

As a result, courts across the country have dutifully enforced this rule in case after case—refusing to hear claims challenging the decision not to investigate or prosecute another person. *See*, *e.g.*, *United States v. Grundhoefer*, 916 F.2d 788, 792 (2nd Cir. 1990) ("[A] private citizen generally lacks standing 'to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'") (quoting *Linda R.S.*); *Sattler v. Johnson*, 857 F.2d 224, 227 (4th Cir. 1988) (rejecting claim that crime victims have "an enforceable right as a member of the public at large and as a victim to have the defendants criminally prosecuted"); *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990) (affirming dismissal of a prison inmate's claim against the sheriff for failing to press criminal charges against correctional officers involved in an alleged assault because the plaintiff "does not have a constitutional right to have someone criminally prosecuted"); *Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law right, much less a constitutional right, to an investigation."); *Parkhurst v. Tabor*, 569 F.3d 861, 866 (8th Cir. 2009) ("federal courts have maintained the distinction in standing between those prosecuted by the state and those who would urge the prosecution of others"); *Sargeant v. Dixon*, 130 F.3d 1067, 1069–70 (D.C. Cir. 1997) (if a person has "an interest in 'being heard' by the grand jury," it is "only because" he has an "interest in seeing certain persons prosecuted"—which is "not legally cognizable within the framework of Article III" under *Linda R.S.*).

And that is so whether the suit is for injunctive relief or damages. *See*, *e.g.*, *Parkhurst*, 569 F.3d at 865 (suit for damages and injunctive relief); *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 901 (7th Cir. 2012) (en banc) (Easterbrook, C.J., concurring)) (crime victims are "not entitled to an order requiring arrest or prosecution of [their assailants], or to damages because of public officials' decision not to do so") (collecting cases).

Yet that is precisely what this suit is—a complaint that a prosecutor has failed to investigate and prosecute another person. *See* First Amended Complaint & Jury Demand at 2, 7, 16, 21–22, *Lefebure v. Boeker*, 390 F. Supp. 3d 729 (M.D. La. 2019) (ECF No. 37) (alleging that D'Aquilla and other officials conspired to ensure that Boeker "would not be held accountable for his actions," would be "protect[ed] . . . from prosecution," "would not be convicted of the alleged rapes," would "walk[] free," and would be "protect[ed] . . . from criminal liability"). *See also Lefebure*, 390 F. Supp. 3d at 745 (acknowledging that "the alleged failure to fully investigate was motivated by a preference in the prosecutorial outcome").

Accordingly, established precedent requires us to conclude that Lefebure lacks standing to sue D'Aquilla based on his failure to prosecute or even investigate Boeker.

## A.

On appeal, Lefebure contests none of this. She simply insists that courts must be able to review her case—notwithstanding *Linda R.S.*— because the decision not to prosecute Boeker may have been based on a broader, discriminatory non-prosecution policy.

But her complaint is premised on allegations of a specific conspiracy between various officials and attorneys, including D'Aquilla, to shield Boeker in particular from prosecution. Her complaint alleges a series of conspiratorial meetings between the defendants to discuss the Boeker case in particular, an agreement that Boeker was telling the truth and Lefebure was lying, and a strategy to conceal the conspiracy by falsely representing to the world that the case was being faithfully investigated and dutifully considered for prosecution, when in fact the parties had already agreed to sweep her claims under the rug.

No. 19-30702
c/w No. 19-30989

And in any event, we do not see how we can in good faith distinguish *Linda R.S.* based on the theory that the decision not to prosecute in this case was in fact dictated by a broader, discriminatory policy not to investigate or prosecute cases involving a certain protected class of victims in violation of the Equal Protection Clause.  After all, that was precisely the complaint in *Linda R.S.* as well.  There the plaintiff alleged that "the policies of the prosecuting authority," which require "declining prosecution" in cases like hers, unconstitutionally "discriminate[]" against victims like her "without rational foundation and therefore violate[] the Equal Protection Clause of the Fourteenth Amendment."  *Linda R.S.*, 410 U.S. at 616, 619.  *See also id.* at 621 (White, J., dissenting) (noting the implications of the Court's logic for other equal protection claims, including those based on race).

Our sister circuits have likewise construed *Linda R.S.* to foreclose suit—and that is so despite the fact that the plaintiffs there alleged unconstitutional discrimination.

For example, in *Parkhurst*, the Eighth Circuit observed that, "[w]hile it is well settled that defendants subjected to or threatened with discriminatory prosecution have standing to bring an equal protection claim, this right has not been extended to crime victims.  The lower federal courts have maintained the distinction in standing between those prosecuted by the state and those who would urge the prosecution of others, *even when the failure to prosecute was allegedly discriminatory*."  569 F.3d at 865–66 (cleaned up and emphasis added) (citing *Linda R.S.* and other authorities).

Likewise, in *Grundhoefer*, the Second Circuit stated that "[t]he interest in the just administration of the laws, including the interest in nondiscriminatory criminal enforcement, is presumptively deemed nonjusticiable even if invoked by persons with something beyond a generalized bystander's concern."  916 F.2d at 792 (quotations omitted).

10

Similarly, in *Sattler*, the Fourth Circuit noted that "counsel suggested that Sattler had an enforceable right . . . as a victim to have the defendants criminally prosecuted. He further urged that such a right was protected by the equal protection clause of the fourteenth amendment. There is, of course, no such constitutional right." 857 F.2d at 227.

As Professor Laurence Tribe explained in his widely noted treatise on constitutional law, "while discriminatory enforcement of criminal laws may be challenged by those against whom such laws are *enforced*, persons injured by criminal conduct which goes *unpunished* because of discriminatory law enforcement do not ordinarily have standing to challenge the discrimination." Laurence H. Tribe, American Constitutional Law 417 (3rd ed. 2000) (citing *Linda R.S.*). "The upshot of *Linda R.S.* . . . is that the interest in the just administration of the laws, including the interest in nondiscriminatory criminal enforcement, is presumptively deemed nonjusticiable even if invoked by persons with something beyond a generalized bystander's concern; only if the litigant is immediately affected as a target of enforcement can that presumption be overcome." *Id.* at 418.

## B.

Lefebure nonetheless suggests that various circuit precedents support her standing to sue the prosecutor here—and thus conflict with our earlier panel decision in this case.

1.      Specifically, she claims that our decision conflicts with both *Shipp v. McMahon*, 234 F.3d 907 (5th Cir. 2000), and *Estate of Macias v. Ihde*, 219 F.3d 1018 (9th Cir. 2000).

But neither of these cases even mention, let alone analyze, standing—presumably because no one challenged standing in these cases. And the same is true with the case identified by amici, *Elliot-Park v. Manglona*, 592 F.3d

1003 (9th Cir. 2010). We cannot rely on these decisions to justify standing when they do not even mention standing—let alone offer a theory for distinguishing *Linda R.S.*—let alone a theory that applies to the specific facts presented here. *See*, *e.g.*, *United States v. Doe*, 932 F.3d 279, 284 (5th Cir. 2019) (noting that we do not give precedential effect to a jurisdictional holding in a previous case when "we never stated the basis of our jurisdiction").

The amicus brief suggests we look past all of this. It says it should be enough that the courts in these cases "fail[ed] to perceive any standing difficulties" anywhere in these opinions.

But that would contradict over two centuries of Supreme Court teachings on this point—not to mention amici's own prior observations.

The Supreme Court has repeatedly instructed lower courts that, "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011). *See also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) (although "Article III standing was . . . assumed by the parties, and was assumed without discussion by the Court," "[w]e have often said that drive-by jurisdictional rulings of this sort . . . have no precedential effect"); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("[T]his Court has followed the lead of Mr. Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*.") (collecting cases).

Indeed, amici have elsewhere expounded these very same principles, explaining that "courts routinely reject claims that plaintiffs have Article III standing based on the fact that prior similarly situated plaintiffs received a ruling on the merits, even though such a ruling must have implicitly held that

the prior plaintiff did have standing." BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 87 (2016) (collecting cases). *See also id.* at 121 (same) (collecting cases).

2.    There's an additional problem with the two cases cited by Lefebure. As noted, under *Linda R.S.*, victims of crime do not have a cognizable interest in the investigation or prosecution of others. But they of course have a compelling interest in their own physical safety and protection. As a result, crime victims have standing to sue when the police refuse to provide them with physical protection. That is because their complaint concerns their own treatment, not the treatment of others.

That principle provides yet another basis for distinguishing *Shipp* and *Estate of Macias*—both of which allege the failure to protect the plaintiff, rather than the failure to prosecute another person.

Cherie Shipp alleged that a group of sheriffs and deputies refused to provide police protection to women like her. She alleged that she was attempting to escape her abusive marriage with Dalton Shipp, and that she repeatedly called the sheriff's office seeking protection from him—but that the deputy "informed Shipp that he would do nothing about Dalton." *Shipp*, 234 F.3d at 909. As a result, Dalton repeatedly beat and later raped and shot his wife. Each time, the sheriff's office did nothing to stop the violence. *See*, *e.g.*, *id.* at 910 ("Deputy Cropper . . . chose to take no action, despite his knowledge of Dalton's propensity for violent behavior."); *id.* ("She screamed for help, but none of the deputies responded.").

In sum, *Shipp* is not about prosecutorial inaction but "police inaction." *Id.* at 912. "Specifically, Shipp claims that the defendants through their policies, practices, and customs afforded less protection to victims of domestic assault than other assault victims." *Id.* at 913.

No. 19-30702
c/w No. 19-30989

The facts of *Estate of Macias* are similarly grotesque: A woman was repeatedly stalked and attacked by her former husband, with the full knowledge of the police—yet the police did nothing. *See* 219 F.3d at 1020–26. Over time, the violent acts escalated, and her husband eventually killed her. Her relatives and estate brought suit alleging that the officers "denied [her] right to equal protection by providing her with inferior police protection on account of her status as a woman, a Latina, and a victim of domestic violence." *Id.* at 1019.

Here, by contrast, Lefebure does not contend that the police refused to protect her before some future assault by her assailant. Instead, she contends that prosecutors refused to investigate or prosecute him after the assault took place. Here, the appeal concerns only the prosecutor—it does not involve any police officer or other law enforcement official who could have provided her physical protection from an assailant yet failed to do so. *See also Parkhurst*, 569 F.3d at 866–67 (distinguishing *Estate of Macias* on the ground that "crime victims . . . have a right to challenge the allegedly discriminatory provision of police protection," whereas "[t]he Parkhursts claim to have been injured by a *failure to prosecute . . . rather than by a failure to provide police protection* to [the victim]") (emphasis added).

In sum, none of the cases cited by Lefebure allow a victim to challenge a prosecutor's decision not to investigate or prosecute another person.[1]

---

[1] Lefebure also claims that our decision conflicts with *Nader v. Saxbe*, 497 F.2d 676 (D.C. Cir. 1974). But the court there found that "plaintiffs *lack* standing to sue." *Id.* at 680 (emphasis added).

Finally, the amicus brief also invokes *Bailey v. Patterson*, 369 U.S. 31 (1962). But it is unclear why amici think *Bailey* helps their cause. For one, *Bailey* simply recognized that railroad passengers have standing to challenge racial segregation on railroads—a proposition no one challenges here. *See id.* at 33 ("[A]s passengers using the segregated transportation facilities they are aggrieved parties and have standing to enforce their rights

No. 19-30702
c/w No. 19-30989

## C.

Both Lefebure and the amicus brief suggest that we should collapse this distinction between the failure to prosecute and the failure to protect—between the failure of police to protect the plaintiff from future crime and the failure of prosecutors to put a third party in jail for past crime.

To be sure, their reasoning is certainly understandable: If word were to get out that a district attorney categorically refuses to prosecute a certain type of crime, or will not prosecute crimes committed against a certain victim demographic, that would surely lead to greater criminal activity of that kind.

So we do not doubt the underlying premise: Less police, more crime. Likewise, less prosecution, more crime. Unquestionably, the denial of prosecution may very well be tantamount to a denial of protection.

But we have no authority to take Lefebure's premise where she wants it to go. For the Supreme Court made clear in *Linda R.S.* that any connection between a non-prosecution policy and subsequent criminal activity is too "speculative" to support standing.

1.      The suit in *Linda R.S.* concerned a criminal statute for failure to pay child support. But the state applied that statute in an allegedly unconstitutional manner, by enforcing it as to legitimate children, but not as to illegitimate children.

Notably, the premise of the suit in *Linda R.S.* is indistinguishable from the premise of Lefebure's suit here: The prosecutor adopted a discriminatory policy of non-prosecution—and that policy resulted in

---

to nonsegregated treatment."). What's more, *Bailey* expressly *reaffirms* the principle we dutifully enforce here—that individuals "lack standing to enjoin criminal prosecutions under Mississippi's breach-of-peace statutes, since they do not allege that they have been prosecuted or threatened with prosecution under them." *Id.* at 32.

criminal misconduct that directly injured the plaintiff. As the complaint in *Linda R.S.* put it: "Plaintiff sues on behalf of herself, her minor daughter, and on behalf of all other women and minor children who have sought, are seeking, or in the future will seek to obtain support for so-called illegitimate children from said child's father. . . . Plaintiff, Linda R.S. has been and will continue to be subjected to economic coercion." The plaintiff's Supreme Court brief made this point as well: "[I]f the District Attorney of Dallas County would enforce Article 602 against the parents of illegitimate children, those parents would contribute to the support and maintenance of their children rather than face the possible consequence of jail. Clearly, because the State of Texas through its District Attorney will not enforce the language of this statute against fathers of illegitimate children those children are not receiving economic benefits which they would otherwise receive."

The Court nevertheless denied standing. As the Court explained, the connection between punishing the perpetrator and preventing crime was too "speculative" to support standing. After all, even "if appellant were granted the requested relief, it would result *only* in the jailing of the child's father"— not the prevention of injury to the plaintiff. 410 U.S. at 618 (emphasis added). To be sure, the jailing of the child's father could have discouraged him from further criminal failure to pay child support. So failing to prosecute and jail the father could have caused the mother's injury. And holding the prosecutor liable could have redressed the mother's injury. But the majority in *Linda R.S.* held that any such connection was too attenuated and "speculative" to support standing: "The prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative. Certainly the 'direct' relationship between the alleged injury and the claim sought to be adjudicated, which previous decisions of this Court suggest is a prerequisite of standing, is absent in this case." *Id.*

16

No. 19-30702
c/w No. 19-30989

2.      Reasonable minds can of course disagree about the wisdom of this conclusion.  Indeed, Justice White did.  In his dissent, he took on the majority on precisely this point.

"The Court states that the actual coercive effect of those sanctions on Richard D. or others 'can, at best, be termed only speculative.'"  *Id.* at 621 (White, J., dissenting).  "This is a very odd statement."  *Id.*  "I had always thought our civilization has assumed that the threat of penal sanctions had something more than a 'speculative' effect on a person's conduct.  This Court has long acted on that assumption in demanding that criminal laws be plainly and explicitly worded so that people will know what they mean and be in a position to conform their conduct to the mandates of law."  *Id.*  "[C]riminal sanctions are useful in coercing fathers to fulfill their support obligations to their legitimate children."  *Id.*

But the majority went the other way, holding instead that the plaintiff "made an insufficient showing of a direct nexus between the vindication of her interest and the enforcement of the State's criminal laws."  *Id.* at 619.  *See also*, *e.g.*, GARNER, *supra*, at 192 ("One important reason to read dissenting opinions is that they may clarify what the majority is doing.").

3.      Our reading of *Linda R.S.* is further reinforced by Professor Tribe.  As he put it, the standing analysis in *Linda R.S.* is not some "doctrinal quirk unique to the field of criminal law administration."  TRIBE, *supra*, at 418.  Rather, it reflects the Court's "broader insistence on a clear showing that the action challenged has in fact *caused* an individual injury, and that a judicial pronouncement of rights will be likely to *redress* that injury."  *Id.*

In short, Lefebure lacks standing due to lack of causation and redressability.  As Tribe explains, *Linda R.S.* is based on the premise that "a victim of an undeterred crime is *not automatically* a victim of nonenforcement."  *Id.* at 417 (emphasis added).  And because the connection

17

is not "automatic," then it is too attenuated for purposes of causation and redressability under *Linda R.S.*

## D.

Undeterred, amici point out that *Linda R.S.* is merely a "5-to-4" decision on the issue of standing.  But that is wrong—not to mention irrelevant.  Two of the four justices who declined to join the majority did *not* say that the plaintiff had standing—to the contrary, those two justices noted that they would have preferred not to reach the standing issue at all, one way or another.  *See Linda R.S.*, 410 U.S. at 622 (Blackmun, J., dissenting).  And regardless (and as amici should well know), federal judges have no right to ignore Supreme Court decisions based on whether they are decided unanimously or by a 5-4 (or 5-2) vote.

Amici also float the notion that *Linda R.S.* "seems unlikely to have survived" various Supreme Court rulings issued over the "nearly fifty years" since that decision.  But once again, amici ignore decades of Supreme Court teachings.  As the Court has repeatedly reminded us, the only court that can overturn a Supreme Court precedent is the Supreme Court itself.  *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (even "if a precedent of this Court . . . appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.") (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)).  Once again, amici know this.  *See, e.g.*, *Carter v. Derwinski*, 987 F.2d 611, 613 n.1 (9th Cir. 1993) (Kozinski, J.) (en banc) (same) (quoting *Rodriguez*).

## E.

Our original decision in this case was unanimous.  Today the court reaches the same conclusion, based on the same reasoning, but this time by a

No. 19-30702
c/w No. 19-30989

2-1 vote. Even so, there is substantial agreement over the substantive legal principles that decide this appeal, not to mention the likely ultimate outcome in this case.

To begin with, the dissent "agree[s] with the majority's view that a victim has no standing to pursue a claim against the district attorney for failure to prosecute her assailant under *Linda R.S.*" *Post*, at 25. "[T]he majority correctly observes [that] *Linda R.S.* precludes standing for those who allege an injury based solely on law enforcement's failure to prosecute someone who had already harmed them." *Id.*

In addition, the dissent agrees that "a dividing line exists between failure-to-protect and failure-to-prosecute claims—that is, claims alleging a failure to protect *before* harm occurs (ex-ante) and a failure to prosecute *after* the fact (ex-post). A plaintiff has standing to pursue the former, but not the latter." *Id.* at 27. That is, of course, precisely our point. *See ante*, at 14 ("Lefebure does not contend that the police refused to protect her *before* some future assault by her assailant. Instead, she contends that prosecutors refused to investigate or prosecute him *after* the assault took place.") (emphasis added).[2]

1.    The dissent nevertheless contends that this suit should be allowed to proceed based on the text and original understanding of the Equal Protection Clause: "As its words indicate, the Equal Protection Clause recognizes a right to equal enforcement of the law that encompasses equal *protection* for crime victims." *Post*, at 33. The dissent quotes Judge Easterbrook, who distilled the original meaning of the Equal Protection

---

[2] It is not clear what the dissent means by "the majority's apparent avoidance" of the distinction between failure to prosecute and failure to protect claims. *Post*, at 27. Far from avoiding the issue, the distinction is essential to our analytical framework—indeed, it's precisely why we are required to reverse.

Clause as follows: "if the police and prosecutors protect white citizens, they must protect black citizens too." *Id.* at 34 (quoting *Del Marcelle*, 680 F.3d at 901 (Easterbrook, C.J., concurring)).

But Judge Easterbrook also explained that a faithful reading of precedent requires us to deny relief due to lack of standing. As he explained, "*Linda R.S.* [holds] that 'a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.'" *Del Marcelle*, 680 F.3d at 901 (Easterbrook, C.J., concurring) (quoting *Linda R.S.*, 410 U.S. at 619). "That is a limit on standing; *Linda R.S.* holds that there is no justiciable controversy, which knocks out *all* substantive legal theories." *Id.* So a plaintiff "is not entitled to an order requiring arrest or prosecution of [his assailants], or to damages because of public officials' decision not to do so." *Id. See also id.* (a plaintiff "needs to show how he was injured by what the defendants did *to* him, rather than by what they didn't do to other people or what they didn't do *for* him").

2.    The dissent attempts to avoid established precedent by recasting this case as a failure to protect case, rather than as a failure to prosecute case. But the dissent acknowledges that at least "some of Lefebure's allegations sound in failure to prosecute." *Post*, at 30. And even setting those allegations aside, the dissent's theory is foreclosed by Supreme Court precedent.

In essence, the dissent theorizes that D'Aquilla's failure to prosecute might very well have "led to her assault." *Id.* at 32. And make no mistake—we have no quarrel with this logic as a conceptual matter. Indeed, we have said as much ourselves: Less prosecution can lead to more crime—and liability rules can encourage or deter law enforcement activity and thereby affect crime rates. *See ante*, at 15.

But as we've explained, Supreme Court precedent prevents us from taking the dissent's logic where it wants us to go. After all, the dissent's theory is the same theory of standing that was pressed in the complaint in *Linda R.S.*, and embraced in Justice White's dissent, but rejected in Justice Marshall's majority opinion. Professor Tribe has confirmed this. All agree that causation and redressability are too attenuated and speculative in cases such as this to warrant standing. And no one has cited a single case to the contrary. The cases cited by the dissent, much like the cases cited by Lefebure, involve the failure to protect, not the failure to prosecute recast as a failure to protect.

3.    The dissent suggests that *Linda R.S.* is somehow distinguishable because the plaintiff here pleaded her case more carefully than the plaintiff did there. *Post*, at 31–32. But that ignores the passages from the complaint and substantive briefing in *Linda R.S.* that we noted earlier. *See ante*, at 15–16. Those passages confirm that, both here and in *Linda R.S.*, the plaintiff theorized that the defendant's discriminatory failure to prosecute "led to" her injury.

Moreover, if the dissent's theory were correct, it could presumably be deployed in *every* discriminatory failure to prosecute case—just replead every failure to prosecute claim as a failure to protect claim. But there's nothing in either the language or the logic of *Linda R.S.* to indicate that the Court saw this as a pleading problem, rather than as a standing problem. And the dissent certainly does not identify any such language in *Linda R.S.*

4.    Finally, we note that the dissent ultimately concedes that the debate over the interpretation of *Linda R.S.* may not matter—that Lefebure might simply win the battle, only to lose the war. Because it's not enough to merely *plead* causation to survive dismissal—the plaintiff also must *prove* it to obtain judgment. To survive summary judgment, the plaintiff needs

evidence that the prosecutor's failure did in fact cause the criminal act that she suffered.  And as the dissent notes, this might not be easy.  "[I]t might be difficult for Lefebure to ultimately prove on the merits that the district attorney's policy, custom, or practice played a role in her assault."  *Post*, at 35.  So there may be little difference between the majority and the dissent as a practical matter.

## III.

Reasonable minds can of course disagree over whether *Linda R.S.* was correctly decided.

As we have noted, for example, Justice White rejected the majority's notion that the connection between criminal law enforcement and crime rates is too "speculative" to confer standing.  410 U.S. at 621.  *See ante*, at 17 (quoting Justice White).  We have likewise observed that less police and less prosecution will indeed lead inevitably to more crime.  *See ante*, at 15.

In addition, Professor Erwin Chemerinsky has persuasively criticized *Linda R.S.* as inconsistent with how courts characterize the nature of the injury in other equal protection contexts.  Ordinarily, he explained, "[w]hen a plaintiff alleges a denial of equal protection, the injury is the denial of the ability to evenly compete."  Erwin Chemerinsky, Constitutional Law: Principles and Policies 87 (6th ed. 2019) (citing, *inter alia*, *Northeastern Fla. Chapter of the Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656 (1993), and *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)).  So "[e]ven if ultimately the plaintiff would not receive the benefit, a favorable court decision redresses the harm by providing equal opportunity."  *Id.*  "*Linda v. Richard* seems inconsistent with [these principles] because there the claimed denial of equal protection was not deemed sufficient for standing."  *Id.*

Professor Tribe has likewise disparaged *Linda R.S.* as "harsh," "bizarre," and not based on "sound reason" considering how courts have analyzed standing in other equal protection contexts. TRIBE, *supra*, at 417 n.8.

But if there is a case for revisiting *Linda R.S.* on these or other grounds, only the Supreme Court has the authority to do so.

\* \* \*

Lefebure's story is one that is shared by all too many survivors who have been doubly victimized by the horrifying crime of sexual assault—first by their assailants, and then by a criminal justice system that fails to enforce the laws on the books. *See*, *e.g.*, *Pierre v. Vannoy*, 891 F.3d 224, 229 & n.5 (5th Cir. 2018) (reversing district court for its "troubling" decision to release convicted child rapist on the ground that rape is a form of sexual activity, and therefore it was perjury not to disclose prior rape when asked about child's prior sexual activity).

Moreover, Lefebure's story is particularly appalling because her alleged perpetrator holds a position of prominence in our criminal justice system as an assistant prison warden. We expect law enforcement officials to uphold the law, not to violate it—to protect the innocent, not to victimize them. "Nothing is more corrosive to public confidence in our criminal justice system than the perception that there are two different legal standards—one for the powerful, the popular, and the well-connected, and another for everyone else." *United States v. Taffaro*, 919 F.3d 947, 949 (5th Cir. 2019) (Ho, J., concurring) (discussing lack of prison time for chief deputy sheriff in Jefferson Parish despite multiple criminal convictions).

Put simply, Lefebure deserved to have the support of her state's elected and appointed prosecutors, investigators, and other officials in her pursuit of justice. If her account is correct, then the system failed her—badly.

No. 19-30702
c/w No. 19-30989

We are horrified by the allegations in this case—the repeated acts of rape and sexual assault, followed by grotesque acts of prosecutorial misconduct. But we have no authority to overturn Supreme Court precedent. If we are to take seriously our obligation to follow Supreme Court precedent, whether we like it or not, then we must conclude that Lefebure lacks standing to sue D'Aquilla. As the adage goes, a principle is not a principle until it costs you. *Cf.* PSALM 15:4 (honoring those who "keep[] an oath even when it hurts").

If Lefebure or amici believe the Supreme Court erred in *Linda R.S.*, they are of course welcome to petition for a writ of certiorari. But for us to do as counsel and amici suggest would "replace judicial hierarchy with judicial anarchy." *M.D. v. Abbott*, 977 F.3d 479, 483 (5th Cir. 2020). *See also* THE FEDERALIST NO. 78 (Alexander Hamilton) ("[t]o avoid an arbitrary discretion in the courts, it is indispensable that [judges] should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them").

We have no choice but to reverse and remand with instructions to dismiss the complaint for lack of subject matter jurisdiction as to D'Aquilla.

24

No. 19-30702
c/w No. 19-30989

JAMES E. GRAVES, JR., *Circuit Judge*, dissenting:

I agree with the majority's view that a victim has no standing to pursue a claim against the district attorney for failure to prosecute her assailant under *Linda R.S. v. Richard D.*, 410 U.S. 614, 618–19 (1973). But an individual may nevertheless have standing to pursue an equal protection claim against law enforcement for discriminatory underenforcement of the law. Because Lefebure seeks to do just that, I respectfully dissent.

## I. Failure to Prosecute v. Failure to Protect

*Linda R.S.* holds that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." 410 U.S. at 619. Specifically, in that case, the Supreme Court determined that a plaintiff lacked standing to seek an injunction requiring her child's father to be prosecuted for failing to make support payments. As the majority correctly observes, *Linda R.S.* precludes standing for those who allege an injury based solely on law enforcement's failure to prosecute someone who had already harmed them. *Parkhurst v. Tabor*, 569 F.3d 861, 866 (8th Cir. 2009); *see Leeke v. Timmerman*, 454 U.S. 83, 85–86 (1981); *United States v. Grundhoefer*, 916 F.2d 788, 792 (2d Cir. 1990); *Doe v. Mayor & City Council of Pocomoke City*, 745 F. Supp. 1137, 1139–40 (D. Md. 1990); *see also Sattler v. Johnson*, 857 F.2d 224, 227 (4th Cir. 1988) (noting that there is no "enforceable right . . . as a victim to have [] defendants criminally prosecuted").

In contrast, our circuit has recognized that equal protection suits based on discriminatory underenforcement of the law, known as failure-to-protect claims, can be brought against law enforcement officials. *Shipp v. McMahon*, 234 F.3d 907, 914 (5th Cir. 2000), *overruled in part on other grounds by McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (en banc); *see Beltran v. City of El Paso*, 367 F.3d 299, 304 (5th Cir. 2004); *Cook v. Hopkins*, 795 F. App'x 906, 915 (5th Cir. 2019); *Kelley v. City of Wake Village*, 264 F.

App'x 437, 442–44 (5th Cir. 2008). In *Shipp*, on which the district court relied, we held that treating domestic violence allegations—a category of crimes disproportionately reported by women—as less of a priority than others violates the Equal Protection Clause. *Shipp*, 234 F.3d at 914; *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."). In doing so, we joined every circuit to consider this issue[1] and adopted the standard articulated in *Watson v. City of Kansas City*, 857 F.2d 690 (10th Cir. 1988): "[T]o sustain a gender-based Equal Protection claim based on law enforcement policies, practices, and customs toward domestic assault and abuse cases, a plaintiff must show: (1) the existence of a policy, practice, or custom of law enforcement to provide less protection to victims of domestic assault than to victims of other assaults; (2) that discrimination against women was a motivating factor; and (3) that the plaintiff was injured by the policy, custom, or practice." *Shipp*, 234 F.3d at 914. We also explained that under the last requirement—causation—"law enforcement would not be held liable for generalized harms that are not traceable to their conduct, policies, or customs" and "would not be called to answer for those injuries that are solely attributable to the perpetrators of the underlying domestic assault." *Id.*

The basic holding of the *Shipp* line of cases is this: an equal protection violation may be found when women who have suffered domestic abuse

---

[1] *See Soto v. Flores*, 103 F.3d 1056, 1066 (1st Cir. 1997); *Eagleston v. Guido*, 41 F.3d 865, 878 (2d Cir. 1994); *Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1030–31 (3d Cir. 1988); *Jones v. Union County*, 296 F.3d 417, 426–27 (6th Cir. 2002); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000); *Ricketts v. City of Columbia*, 36 F.3d 775, 780 (8th Cir. 1994); *Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir. 2000); *Watson v. City of Kansas City*, 857 F.2d 690, 695–96 (10th Cir. 1988).

allege that law enforcement's discriminatory policy of underenforcing domestic violence laws provided a breeding ground for the abuse to occur. *Shipp*, 234 F.3d at 914; *see, e.g., Soto v. Flores*, 103 F.3d 1056, 1066 (1st Cir. 1997); *Watson*, 857 F.2d at 696. None of these cases suggests there is any standing problem with a failure-to-protect claim like that of a failure-to-prosecute claim.

Thus, despite the majority's apparent avoidance of it, a dividing line exists between failure-to-protect and failure-to-prosecute claims—that is, claims alleging a failure to protect *before* harm occurs (ex-ante) and a failure to prosecute *after* the fact (ex-post). A plaintiff has standing to pursue the former, but not the latter. *See Parkhurst*, 569 F.3d at 867; *see also Nader v. Saxbe*, 497 F.2d 676, 681 & n.27 (D.C. Cir. 1974) (explaining that while *Linda R.S.* precludes standing for a plaintiff to seek the "prosecution of a particular individual," it does not prevent standing in all suits in which "victims or potential victims of criminal acts sue to correct allegedly unlawful prosecutorial conduct"). In other words, one does not have standing to allege an injury based solely on law enforcement's failure to prosecute someone who has already harmed her, but she does have standing to allege that a discriminatory underenforcement of the law played a part in causing the harm she suffered. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[I]n an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law."); *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 253 (5th Cir. 2018) ("[P]laintiffs must show that the State is the 'moving force' behind the deprivation.") (quoting *Kentucky*, 473 U.S. at 166); *Bedford v. City of Mandeville*, No. 98-31168, 1999 WL 33964096, at *3 (5th Cir. Oct. 22, 1999) ("In an official capacity suit against a public official the government entity's policy or custom must have played a role in the constitutional violation.").

No. 19-30702
c/w No. 19-30989

Unlike in failure-to-prosecute cases, where a third-party wrongdoer is the source of the direct harm the plaintiff suffered as a crime victim, the allegation in failure-to-protect claims is that law enforcement practices played a role in the plaintiff's victimization. *See, e.g., Shipp*, 234 F.3d at 909 (failure to enforce laws meant to prevent domestic abuse led to plaintiff's shooting at hands of estranged spouse); *Estate of Macias v. Ihde*, 219 F.3d 1018, 1022–26 (9th Cir. 2000) (repeated failure to enforce restraining order led to death at hands of abuser); *Watson*, 857 F.2d at 696 (holding that a jury could infer the plaintiff's "injuries were a result of the policy" of nonenforcement).

Such failure-to-protect claims may include allegations that law enforcement's discriminatory inaction increased the likelihood of crimes or even directly led to crimes against a certain group. This is implicit in some cases—that is, discriminatory refusal to enforce restraining orders and other domestic violence laws logically increases the risk of harm to women—but explicitly stated in others, like here. For example, a court held that a plaintiff stated a failure-to-protect claim by alleging that police officials' "failure to prosecute known and identified perpetrators" of attacks against Indian Americans was based upon race and had the effect of encouraging such attacks, leading to the death of the plaintiff's son. *Mody v. City of Hoboken*, 758 F. Supp. 1027, 1028, 1031 (D.N.J. 1991), *aff'd*, 959 F.2d 461 (3d Cir. 1992). The plaintiff alleged that the "defendants refused to file criminal complaints against people who had engaged in attacks against Indians, sending a message to the larger community that if they committed violent acts against Indians they would not be held accountable." *Id.* at 1031. These kinds of claims may be difficult to prove on the merits, *see* 959 F.2d at 461 (noting verdict was for the defense), but they are cognizable; their ultimate success depends on the plaintiff's establishing a causal link between the

28

discriminatory policy and a subsequent injury.[2] *See Shipp*, 234 F.3d at 914 (noting the "causation requirement" for failure-to-protect claims); *accord Mody*, 959 F.2d at 466 (stating a plaintiff must "establish[] a causal relationship between the discriminatory policy and the injury [suffered]").

Although failure-to-protect claims are usually brought against the police, the same logic applies to prosecutors. Prosecutors are, after all, part of law enforcement, and if anything, they may have more power to implement discriminatory policies than the average officer out on patrol. *See Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting) ("Only someone who has worked in the field of law enforcement can fully appreciate the vast power . . . placed in the hands of a prosecutor with respect to the objects of his investigation."); John F. Pfaff, *Criminal Punishment and the Politics of Place*, 45 FORDHAM URB. L.J. 571, 574 (2018) ("Perhaps the single most important actor in the criminal justice system today is the prosecutor."). The paucity of failure-to-protect cases against prosecutors likely stems in part from absolute prosecutorial immunity. But while prosecutors enjoy immunity from suits filed against them in their individual capacity, *see Imbler v. Pachtman*, 424 U.S. 409 (1976), Lefebure sued D'Aquilla in both his individual and official capacities. The latter is essentially a *Monell* claim of municipal liability, for which there is not an immunity defense. *See Connick v. Thompson*, 563 U.S. 51, 59–60 (2011) (addressing claim brought against Orleans Parish District Attorney in his official capacity under *Monell* standards); *see also Owen v. City of Independence*, 445 U.S. 622, 638 (1980) (refusing to apply immunities for personal liability to *Monell* claims against

---

[2] As I discuss more fully below, we must carefully avoid conflating the requirements for ultimate success on the merits and that which is necessary to confer standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to confer standing.")

local governments because "there is no tradition of immunity for municipal corporations").

Accordingly, if Lefebure were challenging only the failure to prosecute her attacker, then her claim would be barred by *Linda R.S.* But if Lefebure instead, or additionally, challenges an unconstitutional and discriminatory pattern of conduct that contributed to her assault, she has standing to pursue those allegations.

## II. Operative Complaint

Though some of Lefebure's allegations sound in failure to prosecute, her complaint does allege a failure to protect caused by Defendant D'Aquilla's underenforcement of the law. We need not, as the majority suggests, recast Lefebure's suit to reach this conclusion. Indeed, she expressly addressed the dividing line for these claims in a brief filed in the district court:

> Defendant mischaracterizes Plaintiff's claims as asserting a right to have Boeker criminally prosecuted and/or convicted. . . .
>
> But, Plaintiff is not claiming a right to have Boeker prosecuted or convicted, she claims no more than what the Fifth Circuit has recognized for more than a decade, that where a law enforcement policy, practice, or custom provides less protection to victims of domestic violence, including rape and sexual assault, such a custom unconstitutionally violates the right to equal protection where discrimination against a specific class was a motivating factor and the plaintiff was injured by the policy, custom, or practice. *Shipp v. McMahon*, 234 F.3d 907, 914 (5th Cir. 2000) . . . .

The district court agreed that Lefebure's allegations sounded in failure to protect, noting the "distinction" between the *Shipp* cases and failure-to-prosecute claims like *Linda R.S. See Lefebure v. Boeker*, 390 F. Supp. 3d 729,

747–48 (M.D. La. 2019). After reviewing both lines of precedent, the court concluded that it "d[id] not view Plaintiff's claim as one demanding the prosecution of her alleged attacker. Rather, Plaintiff's claim is that the Defendants have an implied policy or custom to not properly investigat[e] claim[s] of sexual assault by women which violates their official duties to protect the public equally." *Id.* at 747.

And Lefebure's operative complaint directly alleges how the failure of the district attorney's office to protect women violated her equal protection rights. She alleges, for example, that:

- D'Aquilla has "a history of discriminating against women . . . [and has] failed to investigate or take seriously reports of sexual assault from women and generally treat[ed] these allegations with less priority than other crimes."
- D'Aquilla's office "does not have a policy requiring rape kits and sexual assault examinations to be picked up and reviewed or sent to the state crime lab for testing."
- D'Aquilla "created a danger of an increased risk of harm to Plaintiff and other victims of sexual assault, which are disproportionately women, by failing to investigate sexual assault crimes, [and] by fostering an environment whereby perpetrators of sexual assault are allowed to prey on victims without fear of investigation."

Lefebure also alleges that her rapist "knew of Defendant D'Aquilla's longstanding refusal to properly investigate sexual assault crimes against women" and that this emboldened him to rape her. These allegations—that the district attorney had a policy of not prosecuting sex crimes against women and that Lefebure's rapist knew about the policy (a plausible allegation since he worked in law enforcement)—support a classic failure-to-protect claim.

No. 19-30702
c/w No. 19-30989

This conclusion is not premised on abstract or conjectural causation, and to the extent the majority relies on *Linda R.S.* to argue as such, I respectfully disagree. In *Linda R.S.*, appellant "made no showing that her failure to secure support payments result[ed] from the nonenforcement, as to her child's father" of the challenged law. 410 U.S. at 618. Under the Texas statute, even if the law was properly enforced, it would result in the child's father being incarcerated, not actual payment of child support. Thus, the Supreme Court found only a speculative—not direct—relationship between the injury and the claim sought to be adjudicated.

In contrast, Lefebure concretely alleges that Defendant D'Aquilla's known failure to properly investigate sexual assault crimes against women led to her assault. Lefebure explains that after the attack, she saw for herself the allegedly discriminatory enforcement practices that allegedly led to her rape: the district attorney's office did not pick up her rape kit for months and failed to present it to the grand jury; no one from the office spoke to her about the crime; and D'Aquilla failed to call relevant witnesses to testify before the grand jury.[3] Lefebure's injuries are, at minimum, "fairly . . . trace[able]" to Defendant D'Aquilla's alleged failure to investigate. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). Causation need only be "logical." *Linda R.S.*, 410 U.S. at 618. It appears, however, that the majority holds Lefebure to a higher standard.

---

[3] As the majority points out, Lefebure's pleadings also refer to her attacker "not be[ing] held accountable for his actions" and being "protect[ed] . . . from prosecution." But these allegations can be read not to argue for Boeker's prosecution but to illustrate D'Aquilla's underenforcement of rape crimes. That is how the district court understood her claims. *Lefebure*, 390 F. Supp. 3d at 747.

No. 19-30702
c/w No. 19-30989

The bigger point is that even if some of Lefebure's allegations are unviable failure-to-prosecute claims, the others I have noted describe a failure to protect. As the district court highlighted, Lefebure alleges a "long-standing" pattern of discrimination that played a role in her harm. *Id.* at 745–46. Lefebure has maintained from the beginning that the district attorney's history of treating sexual assaults reported by women as less of a priority than other crimes "foster[ed] an environment whereby perpetrators of sexual assault [were] allowed to prey on victims," including herself. She thus articulates a failure-to-protect injury that we have recognized for at least twenty years—and one that invokes the original concerns of the Equal Protection Clause.

### III. Origins of the Equal Protection Clause

Although courts first recognized failure-to-protect claims in the 1980s, *see Shipp*, 234 F.3d at 912, the seeds of these claims were sown more than a century earlier. As its words indicate, the Equal Protection Clause recognizes a right to equal enforcement of the law that encompasses equal *protection* for crime victims. "'Protection of the laws' is, after all, a peculiar way to express a general freedom from discrimination," DAVID P. CURRIE, THE CONSTITUTION IN THE SUPREME COURT: THE FIRST HUNDRED YEARS, 1789-1888, at 349 (1985), and the language reflects that "achieving equal protection against lawbreakers was at the core of the Clause's objectives." Lawrence Rosenthal, *Policing and Equal Protection*, 21 YALE L. & POL'Y REV. 53, 70 (2003).

As a leading criminal law scholar explained: "When the Fourteenth Amendment's guarantee of the 'equal protection of the laws' was enacted, one of its chief goals was to ensure that criminal law meant one law alike for blacks and whites—that both ex-slaves and ex-slaveowners would be held to the same legal standards, and that crime victims among both groups received

33

roughly the same measure of legal protection." William J. Stuntz, The Collapse of American Criminal Justice 6 (2011). Judge Easterbrook succinctly described the Clause's "original meaning": "[I]f the police and prosecutors protect white citizens, they must protect black citizens too." *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 901 (7th Cir. 2012) (en banc) (Easterbrook, C.J., concurring). Likewise, Professor Currie has observed that the equal protection was originally understood "to mean that the states must protect blacks to the same extent that they protect whites: by punishing those who do them injury." Currie, *supra*, at 349.

Congressional debates from the Fourteenth Amendment's passage reveal this original understanding of equal protection. Congressman Thaddeus Stevens, co-chair of the Joint Committee on Reconstruction, noted that the Clause would ensure that "[w]hatever law protects the white man shall afford 'equal' protection to the black man. Whatever means of redress is afforded to one shall be afforded to all." Cong. Globe, 39th Cong., 1st Sess. 2459 (1866). Another member of the Committee, Senator Jacob Howard, remarked that the Clause "gives the humblest, the poorest, the most despised of the race . . . the same protection before the law as it gives to the most powerful, the most wealthy, or the most haughty." *Id.* at 2766. Failure-to-protect claims based on discriminatory enforcement of the law therefore touch on the original concern of equal protection.[4]

This protection-centered understanding of the Clause has informed courts' approaches to modern cases involving discriminatory police

---

[4] The majority opines that any plaintiff could simply replead every failure-to-prosecute claim as a failure-to-protect claim. Maj. Op. at 21. This red herring conflates the requirements of plausibly alleging a claim and establishing a basis for standing. A failure-to-protect claim would still be subject to the standing requirements of injury, causation, and redressability. *See Lujan*, 504 U.S. at 560–61. And most failure-to-protect claims arise in the context of a protected category—a scenario that does not always apply.

practices. As one court put it, the "selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) (citing *Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 70 (1872); CURRIE, *supra*, at 349); *see also Del Marcelle*, 680 F.3d at 889 (Posner, J.) (describing "law enforcers who systematically withdraw protection from a group against which they are prejudiced" as "the original target of the equal protection clause"); *Mody*, 758 F. Supp. at 1028 ("An express or implied policy which permits or condones attacks upon members of a particular minority group is the very evil which the post-Civil War statutes sought to eradicate.").

## IV. Conclusion

Lefebure raises that prototypical equal protection claim, centered on the injuries she alleges resulted from a discriminatory failure to enforce the law when it comes to rape cases. A right to be free from discriminatory law enforcement policies that enable crime is distinct from an affirmative right to prosecution. As the injury Lefebure asserts is one caused by a policy of discrimination, it implicates the chief original concern of equal protection. This is an injury she has standing to vindicate.

For these reasons, Lefebure has alleged the type of failure-to-protect claim that has long been cognizable. Such claims guard against the dangerous and discriminatory underenforcement of the law based on a victim's status. Although it might be difficult for Lefebure to ultimately prove on the merits that the district attorney's policy, custom, or practice played a role in her assault, she does have standing to pursue such a claim. Accordingly, I dissent.